Betty LEVERENCE, Thomas Leverence, Ellen Schneider, Eugene Schneider, David Sleight, et al., Plaintiffs-Respondents,

v.

PFS CORPORATION, f/k/a Product Fabrication Service Corporation and Employers Insurance of Wausau, Defendants-Appellants.

Supreme Court

*No. 93–3447. Oral argument April 5, 1995.—Decided June 8, 1995.*

(On certification from the court of appeals.)

(Also reported in 532 N.W.2d 735.)

For the defendants-appellants there were briefs (in the Court of Appeals) by *Timothy J. Muldowney, Jeffrey J. Kassel, Robert J. Dreps* and *LaFollette &*

*Sinykin; Rhea A. Myers* and *Wheeler, Van Sickle & Anderson, S.C.,* all of Madison and oral argument by *Jeffrey J. Kassel.*

For the plaintiffs-respondents there was a brief in the Court of Appeals) by *James A. Olson, Steven J. Schooler* and *Lawton & Cates, S.C.,* Madison and oral argument by *James A. Olson.*

Amicus curiae brief was filed (in the Supreme Court) by *Stephen E. Meili,* counsel, Madison, for the Center for Public Representation, Inc.

Amicus curiae brief was filed (in the Court of Appeals) by *Mark L. Thomsen* and *Cannon & Dunphy, S.C.,* Milwaukee for the Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed (in the Court of Appeals) by *Steven C. Zach* and *Boardman, Suhr, Curry & Field,* Madison for the Civil Trial Counsel of Wisconsin.

Amicus curiae brief was filed (in the Court of Appeals) by *James M. Fergal* and *Schellinger & Doyle, S.C.,* Brookfield for the Alliance of American Insurers.

Amicus curiae brief was filed (in the Court of Appeals) by *Eric Englund,* counsel and *Patrick K. Stevens,* counsel, all of Madison, for the Wisconsin Insurance Alliance and Wisconsin Manufacturers and Commerce.

JANINE P. GESKE, J. This case is before the court on certification by the court of appeals, pursuant to § 809.61, Stats. The defendants-appellants, PFS Corporation and its insurer, Employers Insurance of Wausau (collectively PFS), have been parties to two

previous appeals[1] in which occupants of homes constructed by Tri-State Homes, Inc. (Tri-State) sought damages from PFS for bodily injuries and costs of repairs because the homes retained excessive moisture within the exterior walls. According to the occupants (plaintiffs), the excessive moisture produced rotting, mold, mildew, and the development of toxins which caused them personal injury and which adversely affected the value of their homes. On August 8, 1989, the circuit court granted PFS' motion for summary judgment dismissing the plaintiffs' claims against Tri-State's insurers and against PFS. The court of appeals reversed a portion of the motion for summary judgment on the grounds that a factual dispute existed regarding the scope of PFS' duties to Tri-State home occupants. The case was remanded for trial on plaintiffs' personal injury claims. *Leverence v. U.S. Fidelity & Guaranty,* 158 Wis. 2d 64, 86, 98–99, 462 N.W.2d 218 (Ct. App. 1990), *rev. denied* 157 Wis. 2d 1 (1990).

Prior to trial, plaintiffs submitted a case-management plan in order to deal with the large number of claims. In particular, plaintiffs proposed that a representative number of claims be tried in a test case. After the defendants agreed to the proposal, the circuit court ordered a test-case trial of 20 plaintiff families. Following the test-case trial, which resulted in a judgment for the test-case plaintiffs, the remaining plaintiffs moved the court for summary judgment, arguing that collat-

[1] *See Leverence v. U.S. Fidelity & Guaranty,* 158 Wis. 2d 64, 86, 98–99, 462 N.W.2d 218 (Ct. App. 1990), *rev. denied* 157 Wis. 2d 1 (1990); *Leverence v. PFS Corp.,* (Ct. App. unpublished decision, No. 92–1632, 06/29/93).

eral estoppel (issue preclusion)[2] barred relitigation of the duty and negligence issues raised during the test case. The circuit court granted the plaintiffs' motion for summary judgment based on the principles of aggregation established in *Cimino v. Raymark Industries, Inc.*, 751 F. Supp. 649 (E.D. Tex. 1990). The aggregative procedure adopted by the circuit court would preclude subsequent jury trials. Instead, the average damage award amount from the verdicts of the test-case plaintiffs would serve as the basis for the award of damages to the remaining plaintiffs.

On certification, the issue we now consider is whether the circuit court has the authority to use an aggregative procedure to preclude subsequent jury trials when the parties have not consented to that procedure and no class action has been filed. For the reasons set forth below, we reverse the decision of the circuit court.

Because of the nature of the case and the large number of plaintiffs, the parties agreed to a test-case trial to promote voluntary settlement between defendants and the remaining plaintiffs. At the time, the circuit court did not decide (a) whether the results of the test case would preclude the relitigation of issues or (b) if the test-case plaintiffs were successful, whether the remaining plaintiffs would be entitled to an identical damage award without litigating their individual claims. Since the parties did not expressly consent to the aggregative procedure in advance, we conclude that its use is inconsistent with a defendant's right to a jury trial. Accordingly, we remand the case with directions to vacate the judgment entered against PFS and

---

[2] We now use the term "issue preclusion" in place of "collateral estoppel." *See Michelle T. v. Crozier*, 173 Wis. 2d 681, 687, 495 N.W.2d 327 (1993).

for trial of the remaining plaintiffs' claims on the issues of cause, contributory negligence, and damages.

## I.

The facts and procedural history of this case are as follows. During the 1970's and 1980's, Tri-State manufactured and marketed prefabricated homes in Wisconsin, Minnesota, and the upper peninsula of Michigan. In 1974, PFS contracted with Tri-State to provide inspection and certification that Tri-State homes met certain building standards. In 1987, Tri-State was liquidated in bankruptcy proceedings.

On February 26, 1988, 802 occupants of 222 Tri-State homes filed an action against PFS for negligence and strict liability, claiming that they suffered personal injuries and property damage as a result of excessive moisture in their homes. The moisture problem, according to the occupants, was caused by the defective design of the walls and the use of a building paper, called Thilco paper, for sheathing on the exterior walls.[3] Shortly after filing suit, plaintiffs submitted a case-management proposal to the circuit court. Plaintiffs' proposal included five options: (1) class certification of common questions for trial; (2) trying a test case to resolve issues common to all claim-

---

[3] During the course of litigation, testimony was received stating that 15-pound felt was commonly used as sheathing paper on exterior walls of homes because it was permeable and did not create a vapor barrier. Sheathing paper which creates a vapor barrier should be installed, according to testimony, near the warm face of insulated walls and ceilings. In this litigation, the home occupants argued that Thilco paper, used as a substitute for the 15-pound felt, was improperly installed, causing a vapor barrier and the resultant home damage and health problems.

ants; (3) trying a test case as an aid to settlement; (4) trying a test case of a representative sample based on "sampling techniques" to help shape formulas which approximate a damage figure for particular types of claims; and (5) trial of individual claims under traditional procedures. With regard to option four, plaintiffs' proposal conceded that no Wisconsin precedent supports the use of sampling techniques to determine a total award for all plaintiffs based on the results of the test trial, but that such a procedure might be proper with the parties' consent. The proposal concluded with the further concession that even if plaintiffs were required to put on their case family by family, the litigation was still manageable.

At the pretrial scheduling conference, the court considered plaintiffs' case-management proposal. After some discussion on the record, the court approved the use of the test-case method involving 13 families and 47 individual plaintiffs. Counsel for the defendants asked the court whether the results of the test case would have any preclusive effect on the remaining untried plaintiffs' cases. The court declined to rule on that issue until after the trial was completed.[4] Neither the court nor the parties discussed the adoption of an aggregative procedure at this point; rather, they agreed simply to try the claims of a specified number of plaintiffs. Prior to trial, all the plaintiffs' property damage claims were settled. Additionally, Tri-State, its

---

[4] Twelve test-case families were selected by the court. The plaintiffs and the defendants were each permitted to select four additional families. The defendants, however, declined to select any additional families. Thus, 16 families were initially chosen. Three of the court-selected families were later dismissed when they withdrew their claims, leaving 13 families as the test-case plaintiffs.

insurers, and the manufacturer of the Thilco sheathing paper settled with the plaintiffs and obtained *Pierringer* releases.[5] Consequently, the test case was limited to personal injury claims, with PFS as the sole defendant.

At the conclusion of the test-case trial in February 1992, the jury found: (a) PFS assumed a duty to the home occupants beyond its contractual obligations to Tri-State; (b) PFS was negligent in the performance of that duty; and (c) PFS' negligence was the cause of plaintiffs' injuries.[6] Damages ranging from $5,600 to $7,000 were awarded to all but three adult plaintiffs and $1,400 to $1,600 to all but one of the minor plaintiffs.[7]

Following the entry of judgment, plaintiffs whose cases had not been tried moved for summary judgment, arguing that PFS was precluded from relitigating the issues of duty and negligence. Regarding the issues of causation, damages, and contributory negligence, plaintiffs argued that a theory of aggregation ought to be applied to conserve judicial resources and to avoid the high cost of litigating the numerous and repetitious remaining claims.[8] Under the aggregative procedure,

---

[5] *See Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

[6] The allocation of negligence was as follows: 25 percent to PFS; 25 percent to 30 percent to Tri-State; 5 percent to four of the plaintiff families; and the remaining amounts to several nonparties.

[7] Four cases were not submitted to the jury, and, as a result, no damages were awarded to those plaintiffs.

[8] The plaintiffs estimated that if the remaining claims were tried in successive waves of 20 families each, the following would be required: six to eight trials of approximately 80 persons per trial, lasting two to three weeks each.

the jury verdicts from the test-case plaintiffs would be extrapolated to award the untried adult plaintiffs the average amount of the adult damage award ($4,494), and the remaining minor plaintiffs would receive the average amount awarded to the test-case children ($1,362).

In a decision and order dated September 14, 1992, the circuit court found that relitigation of the duty and negligence issues in the untried cases was precluded. PFS does not challenge this ruling. Regarding aggregation, the circuit court, adopting procedures used in the context of class-action asbestos litigation, specifically *Cimino,* ordered an evidentiary hearing to consider two issues: (a) whether or not the test-case families, randomly selected by the court, comprised a statistically valid, random sample; and (b) whether or not it is possible to determine an average damage award with a sufficiently high degree of confidence as to permit the application of aggregation.

During the evidentiary hearing, the court heard testimony from three expert witnesses—two statisticians and an epidemiologist. Plaintiffs' expert, statistician Dr. Erik Nordheim, testified that he compared 43 characteristics of the test-case plaintiffs with those of the entire population of plaintiffs.[9] Dr. Nordheim concluded that no statistically significant differences existed between the test-case plaintiffs and the entire plaintiff population on 41 of the 43 characteristics, yielding a 95 percent level of confidence.

---

[9] For example, Dr. Nordheim considered characteristics including the plaintiffs' lifestyles and living conditions which might affect household moisture, such as leaky basements, ventilation systems, bathing and laundry practices, as well as the type and frequency of health problems.

PFS introduced two expert witnesses: Dr. Harris Pastides, an epidemiologist; and Dr. James Hickman, a statistician. Both of these experts testified that Dr. Nordheim's conclusion that there was no significant statistical difference between the test-case plaintiffs and the entire group was problematic. First, the test-case families were not a "randomly" drawn sample because four of the families were selected by plaintiffs.[10] Second, the inclusion of the plaintiff-selected families in the test case introduced a range and severity of health complaints which may have swayed the jury in its deliberations. For example, as compared to the court-selected plaintiffs, those selected by the plaintiffs for the test case may have been more ill or more effective in evoking sympathy from jurors—characteristics which were then applied to the plaintiffs as a whole. Finally, these experts concluded that the reliability of the sample was compromised because test-case families were selected *as families,* though jury awards were made on an individual basis.[11]

On November 10, 1993, the circuit court issued a written decision and order in which it acknowledged the disagreement between the parties' experts but concluded, nonetheless, that: (a) the court-selected plaintiffs were a representative random sample of the remaining plaintiffs; (b) the costs of trying the claims of the remaining plaintiffs would effectively deny plaintiffs a remedy for their injuries, in violation of Art. I, § 9

---

[10] Dr. Nordheim conceded during his testimony that he would have preferred that all the families had been randomly sampled.

[11] The study's reliability would have been improved, according to the defendants' experts, if the class of plaintiffs had been placed in subgroups defined by age or illness.

of the Wisconsin Constitution; and (c) because the sampling method achieved a 95 percent confidence level, the aggregative procedure was appropriate. Thereafter, the circuit court entered judgment for the remaining plaintiffs in the amount of $4,494 to each of the 236 adults and $1,362 to each of the children.

## II.

Whether Wisconsin courts may use an aggregative procedure to preclude further jury trials when the parties have not consented to that procedure and no class action has been filed is a question of law which this court reviews *de novo. See State ex rel. Hodge v. Turtle Lake,* 180 Wis. 2d 62, 70, 508 N.W.2d 603 (1993).

In this case, 802 occupants of 222 homes constructed by Tri-State allege that they were all similarly injured, over approximately the same period of time, by the installation of Thilco paper in the exterior walls of their homes. Plaintiffs argue that the circuit court should be able to use aggregation in mass tort litigation because transaction costs are likely to exceed individual recovery, and the number of individual, repetitive trials would place a tremendous burden on the court system.[12] Plaintiffs argue that such litigation requires the formulation of novel case-management techniques.

---

[12] For example, class actions have been used to deal with the avalanche of asbestos-related claims as a means of saving time, litigation costs, and judicial resources. *See* Amy Gibson, Note, "*Cimino v. Raymark Industries:* Propriety of Using Inferential Statistics and Consolidated Trials to Establish Compensatory Damages for Mass Torts," 46 Baylor L. Rev. 463 (Spring 1994); *see also In re A.H. Robins Co., Inc.,* 880 F.2d 709, 712 (4th Cir. 1989) (class action achieves judicial economy by avoiding multiple suits).

*See* Andrew T. Berry & Gita F. Rothschild, "Civil Practice and Litigation Techniques in the Federal Courts," C947 ALI–ABA 215, 218 (1994).

Presented with litigation which promised to be both time-consuming and complex, the circuit court ordered a test-case trial consisting of a small number of plaintiffs. The purpose of selecting and trying the cases of a sample group of plaintiffs was to avoid litigating numerous and repetitive individual claims. The assumption underlying this decision was that, once issues common to the entire plaintiff population were tried, the result would serve to promote a voluntary settlement of the remaining claims. Prior to ordering the test-case trial, the circuit court stated:

> Before we get into the specifics of [selection of the test-case plaintiffs], is there anyone who takes any issue with the plaintiffs' proposal that we do proceed with a fractional number of the claims, proceed to a trial on the assumption that that's going to dispose of some of the overall issues in the case, and will probably render settlement of the remaining claims a lot more practicable than it is now?

The defendants did not object. At the conclusion of the test case, however, the parties were unable to reach a settlement agreement on the other plaintiffs' claims.

Although we commend the circuit court's efforts to resolve the instant litigation in a manner which was intended to preserve due process and promote judicial economy, we conclude that the aggregative procedure cannot be used, as it was here, in place of a party's right to a trial, unless all parties to the litigation consent. PFS argues, and we agree, that the right to a jury trial guaranteed by Art. I, § 5 of the Wisconsin Constitution

is not contingent upon (a) the amount of damages at stake in a given case or (b) the burden the litigation might place upon the court system. Therefore, we conclude the circuit court erred when it found that PFS was not entitled to a jury trial because the plaintiffs' expected damages were low in comparison to the likely cost of the litigation.

On remand, the court and the parties may explore the novel case-management techniques that have recently been made available to litigants by § 802.12, Stats., titled "Alternative dispute resolution." The rule adopted in 1994, pursuant to this court's rule-making authority, "allows circuit court judges to order the parties in civil litigation to attempt settlement through any of eight processes the parties select." *See* Eva Soeka & James Fullin, "The New ADR Referral Statute: Resolving Conflicts Outside Wisconsin Courtrooms," 67 *Wisconsin Lawyer* 12 (Aug. 1994) [hereinafter "The New ADR Referral Statute"]. Some of the options available under this rule are mediation, arbitration, focus groups, summary jury trials and mini-trials.[13] These alternative methods of dispute resolution are intended to provide litigants with a way to avoid traditional litigation that is both consensual and cost-effective. The court may, "upon determining that an action or proceeding is an appropriate one to invoke a settlement alternative," order the parties to select one of the aforementioned options as a means to

[13] Section 802.12, Stats., includes several settlement techniques similar to the test trial in the instant case. Sections 802.12(1)(d), (f), and (j), respectively, provide: a focus group, a mini-trial, and a summary jury trial. Each of these alternatives provides litigants with a nonbinding forum within which to present an abbreviated version of the evidence they would present at trial.

attempt settlement. Section 802.12(2), Stats. This order is not dependent upon the prior filing of a motion. Further, the parties themselves must agree to the process, one which is entirely within the parties' control because it cannot proceed without their consent.[14]

We conclude that circuit courts, when faced with disputes which require creative case-management solutions, should consider ordering the parties to attempt settlement using one of the settlement techniques available under § 802.12, Stats.[15] However, "[u]nless all of the parties consent, an order . . . shall

[14] In "The New ADR Referral Statute," 67 *Wisconsin Lawyer* 12, the authors, members of the Judicial Council committee which drafted § 802.12, Stats., commented that one of the unique aspects of the Wisconsin rule is the emphasis placed on the parties' control of the alternative settlement techniques:

> While the rule does not limit the parties, it does limit what the court can order. First and foremost, the court cannot specify the settlement option, or the neutral provider, *unless the parties cannot agree.* This provision is unique to Wisconsin, among states that have adopted rules or legislation encouraging or mandating dispute resolution processes. It reflects the drafting committee's strong belief that such processes work best when the parties control them.
> Indeed, they work *because* of that control. Since each of the alternatives (except binding arbitration, which cannot be ordered unless all parties consent) resolves the case only if the parties voluntarily agree to the settlement terms, the cooperation needed to select a process and provider is a significant front-end investment in the settlement process. While a 'nudge from the judge' may be needed to embark upon facilitated negotiations, from then on the procedure is most effective with a minimum of coercion.

*Id.* at 15 (emphasis in original).

[15] Under the rule, any party aggrieved by an order to attempt settlement using one of the methods provided in the statute shall be entitled to a hearing to show cause why the order should be vacated or modified. Section 802.12(2)(a).

not delay the setting of the trial date, discovery proceedings, trial or other matters addressed in the scheduling order or conference." Section 802.12(2)(a).

The instant case does not require this court to decide whether aggregation is appropriate in the context of a class-action lawsuit. Plaintiffs here filed suit pursuant to § 803.04, Stats., which provides in pertinent part:

> (1) PERMISSIVE JOINDER. All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Section 803.04(4) permits the court to order separate trials "to prevent delay or prejudice." Accordingly, we conclude the circuit court's reliance on the procedures used by the federal district court in *Cimino* was misplaced.[16]

---

[16] In *Cimino,* the court permitted statistical sampling and aggregation for the purposes of awarding damages to nonsample plaintiffs following a trifurcated trial. Phase I used procedures approved by the Fifth Circuit in *Jenkins v. Raymark Industries,* 782 F.2d 468 (5th Cir. 1986), to resolve all common issues of law and fact. Phase II required a jury determination for each of the work sites, crafts, and relevant time periods as to whether asbestos-containing insulation products were used and which groups were sufficiently exposed to such products. This phase was not tried because the parties stipulated to what the jury findings would have been. Phase III assessed damages. All *Cimino* plaintiffs waived their right to an individualized verdict and agreed to the sampling procedure. Defendants objected to the procedure on the grounds that it violated their constitutional right to a trial by jury. Following an evidentiary hearing

PFS argues, and we agree, that the aggregative procedure as used in this case could not be implemented without its consent. PFS is entitled to trial by jury on the remaining plaintiffs' claims on the issues of causation, contributory negligence, and damages. Issue preclusion bars relitigation of the issues of duty and negligence. Although we remand for a trial on the aforementioned claims and issues, we strongly recommend that the parties consider the alternative methods of dispute resolution provided by § 802.12, Stats.

*By the Court.*—The decision of the circuit court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

to determine whether the random samples were actually representative of the remaining plaintiffs, the *Cimino* court was satisfied and ordered the average damage verdicts in each disease category to be awarded to nonsample members in that category. *See Cimino,* 751 F. Supp. at 653, 664–65. The case is now before the Fifth Circuit on appeal.