SOUTHWESTERN REFINING COM-
 PANY, INC., Kerr–McGee Corpora-
 tion, and Sherwood Breaux, Petition-
 ers,

v.

Julia BERNAL, et al., Respondents.

No. 98–0154.

Supreme Court of Texas.

Argued April 7, 1999.

Decided May 11, 2000.

Frank Weathered, L. Nelson Hall, Corpus Christi, for Petitioners.

Christopher A. Kesler, George M. Fleming, Debra B. Hayes, Andres Christian Pereira, Sylvia Davidow, Houston, for Respondents.

Justice GONZALES delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice BAKER, Justice ABBOTT and Justice O'NEILL joined.

The principal issue in this interlocutory appeal is the propriety of certifying a class action of 904 plaintiffs against Southwestern Refining Company for alleged personal injuries arising from a refinery tank fire in Corpus Christi, Texas. The trial court certified the class and directed that the class proceed in three phases: the first to determine general liability and gross negligence; the second to determine punitive damages; and the third to determine causation and actual damages. The court of appeals modified the certification order to require determination of the class representatives' actual damages before punitive damages may be assessed for the whole class. 960 S.W.2d 293. Southwestern filed this petition for review, contending that this Court has conflicts jurisdiction and that the common issues do not predominate over the individual issues. We agree with both of Southwestern's contentions. Therefore, we reverse the court of appeals' judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

I

On January 26, 1994, at about 7:30 a.m., a slop tank at a Southwestern refinery in

Corpus Christi exploded. Julia Bernal, Mary De La Garza, Anita Barrerra and Josephine Suarez, four Corpus Christi residents, sued Southwestern and four other defendants for extreme fear and mental anguish caused by the sight and sound of the explosion and for personal injuries and property damages caused by toxic exposure. They allege that the explosion and ensuing fire sent a plume of toxic smoke into the air and that soot and ashes from the smoke descended on their homes in the surrounding neighborhoods. Plaintiffs claim that because of the explosion, they suffered respiratory difficulties, skin irritation, eye irritation, headaches, and nausea, and their lawns, foliage, and pets died.

After an additional 900 claimants joined the lawsuit, plaintiffs moved to certify the personal injury claims as a class action consisting of all of the claimants. The trial court granted the motion, certifying the class with nineteen class representatives under Rule 42(b)(4) of the Texas Rules of Civil Procedure. TEX.R. CIV. P. 42(b)(4). And as the plaintiffs requested, the court excluded from the class all claims for property or diminution-in-value damages. The court's order granting the motion provided for a three-phase trial:

> Phase I will address the alleged liability of defendants to the named class representatives on the issues of negligence, strict liability, toxic trespass, nuisance and gross negligence. Phase I will establish whether defendants are liable for the explosion and whether the released materials were capable of causing the harm alleged by the class.

> If during Phase I there is a finding of gross negligence, Phase II of the trial will determine the amount to be recovered by the class as punitive damage[s].

> Phase III will determine whether the individual class members can show sufficient specific injuries or damages and whether they were proximately caused by the release due to the tank explosion. The amount of punitive damages, awarded in Phase II, if any, will be proportionately reduced by the number of individuals who can not make the requisite showing of actual damages and proximate cause in Phase III, if any.

The order does not indicate whether the trial court envisioned a single jury deciding all three phases, including the 904 individual damage claims.

Southwestern brought an interlocutory appeal seeking to reverse the certification order. It argued that the prerequisites to class certification, most notably the requirement that common issues predominate over individual ones, were not met. It also argued that the trial court erred by splitting the trial into different phases, in which fault and punitive damages would be determined before causation and actual damages.

The court of appeals held that the class certification satisfied the class action prerequisites. While it acknowledged that "individual issues may predominate in determination of causation and damages," it reasoned that the class was maintainable because the modified trial plan called for the individual issues to be litigated separately from the common issues. 960 S.W.2d at 299. The court suggested that these issues would not necessarily overwhelm the jury because "[i]t remains to be seen" whether "the issues of causation and damages may be proven [expeditiously] by the use of models, formulas, and damage brochures." *Id.* at 297. In any event, the court suggested, separate juries could be summoned to resolve the individual issues. *See id.*

However, in response to Southwestern's arguments, the court of appeals modified the trial plan to require proof of actual damages by the nineteen class representatives before the jury may resolve punitive damages for the entire class. Under the modified trial plan, phase I remained as the trial court originally ordered, phase II would determine proximate cause and actual damages for the nineteen class representatives, phase III would determine pu-

nitive damages for the entire class, and phase IV would determine proximate cause and actual damages for the remaining 885 class members. Southwestern petitions for review from this decision, arguing that the trial court's certification order was an abuse of discretion. Southwestern contends that the class action is not maintainable because individual issues will predominate over common questions of law and fact. Southwestern also objects to the class action as being an inferior and unmanageable method of adjudicating the controversy. Moreover, Southwestern argues that liability and damage issues cannot be tried in separate phases and that punitive damages for the entire class cannot be tried until the jury determines actual damages for the entire class. Finally, Southwestern maintains that the class is not so numerous that joinder is impracticable, that class counsel have a conflict of interest because they are also counsel for those members who must decide whether to opt out, and that class notice was deficient.

## II

■ As a preliminary matter, we must determine if we have jurisdiction to consider this interlocutory appeal. Jurisdiction over interlocutory appeals is generally final in the courts of appeals. *See* Tex. Gov't Code § 22.225(b) ("Except as provided by Subsection (c) or (d), a judgment of a court of appeals is conclusive on the law and facts, and a writ of error is not allowed from the supreme court, in the following civil cases: ... (3) an appeal from an interlocutory order appointing a receiver or trustee or from other interlocutory appeals that are allowed by law; ...."). But this Court has jurisdiction over interlocutory appeals when the court of appeals' decision conflicts with a prior decision of another court of appeals or this Court on a question of law material to the decision of the case. *See id.* §§ 22.225(c); 22.001(a)(2). As we recently observed, the standard for conflicts jurisdiction is whether the rulings in two cases are " 'so far

upon the same state of facts that the decision of one case is necessarily conclusive of the decision in the other.' " *Coastal Corp. v. Garza,* 979 S.W.2d 318, 319 (Tex.1998) (quoting *Gonzalez v. Avalos,* 907 S.W.2d 443, 444 (Tex.1995)). Stating it another way:

> [f]or jurisdiction to attach on the basis of conflict[,] "[t]he conflict must be on the very question of law actually involved and determined, in respect of an issue in both cases, the test being whether one would operate to overrule the other in case they were both rendered by the same court."

*Coastal,* 979 S.W.2d at 319–20 (quoting *Christy v. Williams,* 156 Tex. 555, 298 S.W.2d 565, 567 (1957)).

Southwestern contends that the court of appeals' opinion in this case conflicts with: (1)*Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994), regarding whether punitive damages can be tried before proximate causation and actual damages; (2) *RSR Corp. v. Hayes,* 673 S.W.2d 928 (Tex.App.—Dallas 1984, writ dism'd), regarding the propriety of class certification of personal injury claims, and (3) *Iley v. Hughes,* 158 Tex. 362, 311 S.W.2d 648 (1958), regarding whether different elements of a personal injury claim can be tried in separate phases by separate juries.

■ We begin our conflicts analysis with *Moriel.* In *Moriel,* we held that upon a party's request, a trial court must bifurcate the trial and obtain jury findings on liability and actual damages *before* allowing evidence—including evidence of a defendant's net worth—on the amount of punitive damages:

> Under this approach, the jury first hears evidence relevant to liability for actual damages, the amount of actual damages, and liability for punitive damages (e.g., gross negligence), and then returns findings on these issues. If the jury answers the punitive damages liability question in the plaintiff's favor, the same

jury is then presented evidence relevant only to the amount of punitive damages, and determines the proper amount of punitive damages, considering the totality of the evidence presented at both phases of the trial.

879 S.W.2d at 30. The court of appeals acknowledged the tension between the trial court's certification order and the rule in *Moriel* that a jury must decide liability and actual damages issues before it considers punitive damages. 960 S.W.2d at 298. The court of appeals' solution was to modify the certification order by adding another phase, prior to the punitive damages phase, to determine the class representatives' actual damages. Thus, the order of proof in the court of appeals' modified order is (1) duty, breach of duty, and gross negligence issues; (2) the nineteen class representatives' proximate cause and actual damages issues; (3) punitive damages for the entire class; and (4) the 885 remaining plaintiffs' proximate cause and actual damages issues.

Southwestern contends that the multiphase trial plan, as modified by the court of appeals, still conflicts with *Moriel*. Under the modified trial plan, evidence related to punitive damages, including net worth, will be introduced before the jury is asked to decide causation and actual damages for the 885 nonrepresentative members of the class. Also, the plan will require the jury to decide punitive damages before "the totality of the evidence," including causation and the amount of actual damages for the 885 nonrepresentative class members, is presented. Plaintiffs argue that the modified trial plan does not conflict with *Moriel* because this case, unlike *Moriel*, is a class action, and that the different procedural context legitimately distinguishes the cases.

 We disagree. Conflicts jurisdiction does not require that the two cases be identical either on the facts underlying the causes of action nor on the procedural facts. As we noted in *Coastal:*

In short, cases do not conflict if a material factual difference legitimately distinguishes their holdings. On the other hand, immaterial factual variations do not preclude a finding of jurisdictional conflict. A conflict could arise on very different underlying facts if those facts are not important to the legal principle being announced.

*Coastal,* 979 S.W.2d at 320. In *Coastal* the Court reviewed the conflict that conferred jurisdiction on our Court in *Newman v. Obersteller,* 960 S.W.2d 621 (Tex. 1997). We observed that in *Newman,* three cases conflicted on a question of statutory construction, giving us jurisdiction, even though the legal question arose in each case in different factual circumstances. *See Coastal,* 979 S.W.2d at 320 (discussing *Newman v. Obersteller*). The cases discussed in *Newman* were different not only in the facts relating to the cause of action but also in their procedural facts: two were appealed from denial of summary judgments, and the third was appealed from a directed verdict after a trial on the merits. *Compare Newman v. Obersteller,* 915 S.W.2d 198 (Tex.App.—Corpus Christi 1996), *rev'd,* 960 S.W.2d 621 *and City of Galveston v. Whitman,* 919 S.W.2d 929 (Tex.App.—Houston [14th Dist.] 1996, writ denied) *with Davis v. Mathis,* 846 S.W.2d 84 (Tex.App.—Dallas 1992, no writ). As *Coastal* and *Newman* illustrate, our jurisdictional analysis must focus on whether differences in the facts, including procedural facts, prevent the holding in one case from controlling in another. Conversely, if the form of the proceeding is not important to whether the substantive legal principles we announced in *Moriel* would control the decision in this case, then we have jurisdiction to resolve the conflict.

Here, the form of the lawsuit as a class action is not important to the substantive legal principles we announced in *Moriel* because of the breadth of our holding in that case. Our decision in *Moriel* is striking because it is stated as a categorical

imperative. We did not limit our holding to the particular facts of the case, nor did we state the principle as a general rule, thereby implying that there may be exceptions. Instead, we said that the *Moriel* standards "apply to all punitive damage cases tried in the future." 879 S.W.2d at 26. We made no exception for class actions.

Moreover, our procedural rules do not permit the form of the proceeding to determine whether substantive legal principles will control. The dissent argues, in effect, that *Moriel* does not conflict because class actions are just different from ordinary litigation. But class actions do not exist in some sort of alternative universe outside our normal jurisprudence. Our procedural rules provide otherwise: the form of an action under the rules must not "enlarge or diminish any substantive rights or obligations of any parties to any civil action." TEX.R. CIV. P. 815. Thus the form of this lawsuit, per se, is not a material factual difference that distinguishes the principles we announced in *Moriel.*

In summary, we held in *Moriel* that in all punitive damages cases, a jury must return findings on liability and actual damages issues before it hears any evidence on punitive damages. In this punitive damages case, the court of appeals held that the plaintiffs may present evidence of punitive damages and obtain a finding before deciding most plaintiffs' actual damages. If *Moriel* is good law, the court of appeals' holding cannot be sustained. Conversely, we can uphold the court of appeals' holding only by overruling *Moriel* to the extent it applies to class actions. The ruling in one is necessarily conclusive in the other on a question of law material to the decision in the case.

■ Accordingly, we conclude that the court of appeals' decision would overrule *Moriel* had both been issued by the same court and we determine that the rulings in *Moriel* and in the court of appeals' decision are "so far upon the same state of facts that the decision of one case is necessarily conclusive of the decision in the other." *Coastal,* 979 S.W.2d at 319. This case conflicts with *Moriel,* and we therefore have jurisdiction here. Because we conclude that the court of appeals' decision in this case conflicts with *Moriel* we need not conduct a conflicts analysis of *RSR* and *Iley.* Moreover, once a conflict confers jurisdiction on our Court, the case is before us for all purposes. *See Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 643–44 (Tex.1995); *Stafford v. Stafford,* 726 S.W.2d 14, 15 (Tex.1987). Thus, we turn to Southwestern's complaints in this interlocutory appeal.

### III

■ We consider first the issue raised by the jurisdictional question, whether we should reconsider *Moriel* and exempt class actions from its pronouncement about the order of proof in punitive damages cases. The court of appeals reasoned that its modified order would solve the order-of-proof problem:

> This plan still allows the jury to resolve the common issue of punitive damages relatively early in the litigation, but also allows the jury to have an understanding of the extent of actual damages suffered by the class before assessing punitive damages.

960 S.W.2d at 299. Plaintiffs contend that the court of appeals complied with *Moriel* by requiring the jury to decide actual damages for the class representatives before deciding exemplary damages. Moreover, plaintiffs argue that the plan guards against the prejudicial evidentiary concerns that led to bifurcation in *Moriel* by ordering a reduction of exemplary damages for any class member who is unable to prove actual damages.

■ The considerations that go into the decision to award punitive damages do not depend on whether the case was brought as a class action. In *Moriel* we were concerned that existing procedures

failed to ensure that punitive damage awards " 'are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages.' " *Moriel,* 879 S.W.2d at 29 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). To achieve such proportionality, under *Moriel,* a jury must decide the amount of punitive damages based on the totality of the evidence from the liability phase as well as the punitive damages stage. Here, deciding the nineteen class representatives' actual damages first does not satisfy the concerns underpinning the legal principles announced in *Moriel.* Under the court of appeals' modified order, the jury would decide punitive damages for the entire class without knowing the severity of the offense or the extent of compensatory damages, if any, for each of the 885 plaintiffs. The certification order's provision to eliminate punitive damages for plaintiffs who are not able to prove actual damages may limit the harm to Southwestern. But the modified trial plan is nevertheless prejudicial because it fails to ensure that punitive damages have some understandable relationship to compensatory damages and are not grossly out of proportion to the severity of the offense for each of the 885 plaintiffs. The concerns this Court articulated in *Moriel* apply equally in class action cases. Accordingly, we see no reason to except class actions from the rule articulated in *Moriel.* We now turn to the class certification issues.

## IV

 Southwestern argues that the trial court abused its discretion by certifying this case as a class action. Rule 42 of the Texas Rules of Civil Procedure governs class certification. Tex.R. Civ. P. 42. The rule is patterned after Federal Rule of Civil Procedure 23; consequently, federal decisions and authorities interpreting current federal class action requirements are persuasive authority. *See RSR Corp. v. Hayes,* 673 S.W.2d 928, 931–32 (Tex.

App.—Dallas 1984, writ dism'd). All class actions must satisfy four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). *See* Tex.R. Civ. P. 42(a). In addition to these prerequisites, class actions must satisfy at least one of four subdivisions of Rule 42(b). Plaintiffs assert this class action satisfies Rule 42(b)(4), which requires common questions of law or fact to predominate over questions affecting only individual members and class treatment to be "superior to other available methods for the fair and efficient adjudication of the controversy." Tex.R. Civ. P. 42(b)(4); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (discussing the kinds of class actions that can be maintained under federal rule 23(b)); *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 (9 th Cir.1976) (observing that certification under federal rule 23(b)(1)(A), the federal counterpart to Texas's Rule 42(b)(1)(A), will ordinarily be inappropriate in an action for damages).

We consider Rule 42(b)(4)'s predominance requirement first because it is one of the most stringent prerequisites to class certification. To aid a court in determining if (b)(4) certification is appropriate, the rule establishes a list of nonexhaustive factors to consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation in the particular forum; (D) the difficulties

likely to be encountered in the management of a class action.

TEX.R. CIV. P. 42(b)(4).

■ Courts determine if common issues predominate by identifying the substantive issues of the case that will control the outcome of the litigation, assessing which issues will predominate, and determining if the predominating issues are, in fact, those common to the class. *See Reserve Life Ins. Co. v. Kirkland,* 917 S.W.2d 836, 839 (Tex.App.—Houston [14 th Dist.] 1996, no writ); *Amoco Prod. Co. v. Hardy,* 628 S.W.2d 813, 816 (Tex.App.—Corpus Christi 1981, writ dism'd). The test for predominance is not whether common issues outnumber uncommon issues but, as one court stated, "whether common or individual issues will be the object of most of the efforts of the litigants and the court." *Central Power & Light Co. v. City of San Juan,* 962 S.W.2d 602, 610 (Tex.App.—Corpus Christi 1998, writ dism'd w.o.j.); *see also Glassell v. Ellis,* 956 S.W.2d 676, 686 (Tex.App.—Texarkana 1997, writ dism'd w.o.j.); *Adams v. Reagan,* 791 S.W.2d 284, 289 (Tex.App.—Fort Worth 1990, no writ). If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate. Ideally, "a judgment in favor of the class members should decisively settle the entire controversy, and all that should remain is for other members of the class to file proof of their claim." *Life Ins. Co. of the Southwest v. Brister,* 722 S.W.2d 764, 772 (Tex.App.—Fort Worth 1986, no writ); *accord Sun Coast Resources Inc. v. Cooper,* 967 S.W.2d 525, 533–34 (Tex.App.—Houston [1 st Dist.] 1998, pet. dism'd w.o.j.); *Microsoft Corp. v. Manning,* 914 S.W.2d 602, 611 (Tex.App.—Texarkana 1995, writ dism'd). Before we determine whether individual issues predominate over common ones in this class, we consider how to properly apply the predominance requirement.

## V

■ The predominance requirement is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses. But the predominance requirement has not always been so rigorously applied. When presented with significant individual issues, some courts have simply remarked that creative means may be designed to deal with them, without identifying those means or considering whether they would vitiate the parties' ability to present viable claims or defenses. *See, e.g., Amerada Hess Corp. v. Garza,* 973 S.W.2d 667, 680 (Tex.App.—Corpus Christi 1996), *writ dism'd w.o.j.,* 979 S.W.2d 318 (Tex.1998); *Franklin v. Donoho,* 774 S.W.2d 308, 313 (Tex.App.—Austin 1989, no writ) (both expressing faith that, but not suggesting how, the trial court can creatively deal with significant individual issues in a manner that will be both fair and efficient). Other courts have indulged every presumption in favor of the trial court's ruling, viewed the evidence in the light most favorable to that ruling, and frankly acknowledged that if they erred, it would be in favor of certification. *See, e.g., Health & Tennis Corp. of Am. v. Jackson,* 928 S.W.2d 583, 587 (Tex.App.—San Antonio 1996, writ dism'd w.o.j.); *Reserve Life Ins. Co. v. Kirkland,* 917 S.W.2d 836, 839, 843 (Tex.App.—Houston [14th Dist.] 1996, no writ). Still others have postulated that because a settlement or a verdict for the defendant on the common issues could end the litigation before any individual issues would be raised, predominance need not be evaluated until later. *See, e.g., Ford Motor Co. v. Sheldon,* 965 S.W.2d 65, 72 (Tex. App.—Austin 1998), *rev'd,* 22 S.W.3d 444 (Tex.2000); *Union Pac. Resources Co. v. Chilek,* 966 S.W.2d 117, 123 (Tex.App.—Austin 1998, pet. dism'd w.o.j.). Other courts have suggested that the predominance requirement is not really a preliminary requirement at all because a class can always later be decertified if individual

issues are not ultimately resolved. *See National Gypsum Co. v. Kirbyville Indep. Sch. Dist.*, 770 S.W.2d 621, 627 (Tex. App.—Beaumont 1989, writ dism'd w.o.j.) ("There can be no danger in this proceeding to Appellant for the trial court recognized in his order that individual issues would have to be addressed, and stated, 'This certification, of course, may be altered, amended or withdrawn at any time before final judgment.'"); *Life Ins. Co. v. Brister*, 722 S.W.2d 764, 775 (Tex.App.—Fort Worth 1986, no writ) (suggesting that when predominance is in doubt, "the most efficient approach for the trial court is to allow class certification at the present time subject to a motion by the defendants after the case has developed to dissolve the class on the grounds that common questions are not predominant at trial.").

We reject this approach of certify now and worry later. In *Amchem Products, Inc. v. Windsor*, the United States Supreme Court reemphasized the importance of vigorously applying the predominance requirement in a class-action certification that sought global settlement of current and future asbestos-related claims. There the Supreme Court emphasized the importance of carefully scrutinizing the predominance standard to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623, 117 S.Ct. 2231. Noting that "the predominance criterion is far more demanding" than the commonality requirement, the Court determined that the plaintiffs' shared experience of asbestos exposure might meet the commonality requirement, but failed to predominate over individual issues. *Amchem Prods., Inc.*, 521 U.S. at 623, 117 S.Ct. 2231. In effect, the exacting standards of the predominance inquiry act as a check on the flexible commonality test under Rule 42(a)(2).

 Courts must perform a "rigorous analysis" before ruling on class certification to determine whether all prerequisites to certification have been met. *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also In re American Medical Sys., Inc.*, 75 F.3d 1069, 1078–79 (6th Cir.1996). Although it may not be an abuse of discretion to certify a class that could later fail, we conclude that a cautious approach to class certification is essential. The "flexibility" of Rule 42 "enhances the usefulness of the class-action device, [but] actual, not presumed, conformance with [the Rule] remains ... indispensable." *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364. As the Supreme Court stressed in *Amchem*: "[C]ourts must be mindful that the rule as now composed sets the requirements they are bound to enforce.... The text of a rule ... limits judicial inventiveness." *Amchem Prods., Inc.*, 521 U.S. at 620, 117 S.Ct. 2231; *see also General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 954 (Tex.1996)(emphasizing "the importance of the trial court's obligation to determine that the protective requirements of Texas Rule 42 are met").

 Thus it is improper to certify a class without knowing how the claims can and will likely be tried. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996). A trial court's certification order must indicate how the claims will likely be tried so that conformance with Rule 42 may be meaningfully evaluated. "Given the plaintiffs' burden, a court cannot rely on [mere] assurances of counsel that any problems with predominance or superiority can be overcome." *Castano*, 84 F.3d at 742. To make a proper analysis, "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano*, 84 F.3d at 744. Any proposal to expedite resolving individual issues must not unduly restrict a party from presenting viable claims or defenses without that party's consent. *See* Tex.R. Civ. P. 815; Tex. Gov't Code § 22.004(a)

(stating that Texas's procedural "rules may not abridge, enlarge, or modify the substantive rights of a litigant"). If it is not determinable from the outset that the individual issues can be considered in a manageable, time-efficient, yet fair manner, then certification is not appropriate. *See General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 959 (Tex.1996) ("[T]he trial court [found] that 'there is uncertainty as to whether a class action could be properly certified and maintained through trial because there are potentially substantial individual questions of fact and law and obstacles to the manageability of the action on a class basis.' If the trial court believed this to be the case, it should not have certified the class....").

We turn to the application of the class-action device generally in personal injury cases and determine whether individual issues predominate over common ones in this class.

## VI

■■■■■ Personal injury claims will often present thorny causation and damage issues with highly individualistic variables that a court or jury must individually resolve. *See generally Amchem Prods., Inc.* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689. Thus, the class action will rarely be an appropriate device for resolving them. The drafters of Federal Rule 23(b)(3), the counterpart to our Rule 42(b)(4), recognized this when they observed that personal injury claims are generally inappropriate for class certification:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

39 F.R.D. 69, 103 (1966).

Here the causation and damages issues are uniquely individual to each class member. The proximity of the explosion to the residents' homes varied from less than one-half of a mile to almost nine miles. There is evidence that prevailing winds blew the smoke away from the residents' homes. When the tank explosion occurred, class members were scattered in locations that varied from less than one mile from the explosion to as far away as Beaumont. Some were inside their homes, others were outside; some were walking, others were driving. One representative, in fact, admitted that he did not think he was exposed to anything from the tank fire and explosion. Another representative did not even know who he was suing or what he was suing over. In his deposition, he expressed his belief that this lawsuit represented claims relating to a 1993 benzene release from a Coastal Corporation plant. Plaintiffs' counsel concede that there are class members who were not or who do not think they were exposed. One of the class members, for example, was in a Beaumont prison when the explosion occurred. Another was in California. Nevertheless, plaintiff's counsel insist that class members who were not or who do not think they were exposed need to be included and represented within the class so that the class can cover the whole spectrum of "less severe cases, medium cases and really good cases."

We conclude that individual issues predominate over common ones in this class. The common-issues phase will establish whether Southwestern is legally responsible for the explosion and whether the released materials were capable of causing the harm some members of the class allege. The answers to these questions are necessary in considering Southwestern's liability, but they will not establish whether and to what extent each class member was exposed, whether that exposure was the

proximate cause of harm to each class member, whether and to what extent other factors contributed to the alleged harm, and the damage amount that should compensate each class member's harm. As for these latter issues, highly individualistic variables including each class member's dosage, location, activity, age, medical history, sensitivity, and credibility will all be essential to establishing causation and damages.

Rule 42(b)(4) requires class treatment to be superior for the fair and efficient adjudication of the controversy. *See* TEX.R. CIV. P. 42(b)(4). Here Southwestern is entitled to a fair opportunity to individual determinations of causation and damages for each of the 904 plaintiffs—a difficult undertaking for any jury. Plaintiffs argue that under the trial plan a single jury in a single lawsuit can and will consider the individual issues fairly and efficiently. Plaintiffs assert that they can present their entire case—all four phases of it—in six to eight weeks. First, they plan to offer evidence on most elements of damages using medical records, summaries, and expert testimony. Second, they plan to submit a charge to the jury with damages and proximate cause issues using a matrix format. Plaintiffs urge that this strategy, coupled with the use of models, formulas, and damage brochures, will allow them to litigate phase IV expeditiously and enable the jury to sort through and deliberate each personal injury claim.

■■■ With the help of models, formulas, extrapolation, and damage brochures, plaintiffs may indeed be able to present their case in an expeditious manner. Likewise, Southwestern may choose to present a timely and efficient defense, making arguments and presenting evidence on only a generalized, class-wide basis. But, while Southwestern may not be entitled to separate trials, it is entitled to challenge the credibility of and its responsibility for each personal injury claim individually. *See generally In re Colonial Pipeline,* 968 S.W.2d 938, 942 (Tex.1998);

*Able Supply Co. v. Moye,* 898 S.W.2d 766 (Tex.1995) (both vindicating defendants' rights, in mass tort cases, to case-by-case discovery on basic medical and causal information).

■■■ The class action is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment. It is not meant to alter the parties' burdens of proof, right to a jury trial, or the substantive prerequisites to recovery under a given tort. Procedural devices may "not be construed to enlarge or diminish any substantive rights or obligations of any parties to any civil action." TEX.R. CIV. P. 815; *see also* TEX. GOV'T CODE § 22.004(a); *In re Ethyl Corp.,* 975 S.W.2d 606, 613 (Tex. 1998) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation.") (quoting *In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 853 (2d Cir.1992)). Although a goal of our system is to resolve lawsuits with "great expedition and dispatch and at the least expense," the supreme objective of the courts is "to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." TEX.R. CIV. P. 1. This means that "convenience and economy must yield to a paramount concern for a fair and impartial trial." *In re Ethyl Corp.,* 975 S.W.2d at 613. And basic to the right to a fair trial—indeed, basic to the very essence of the adversarial process—is that each party have the opportunity to adequately and vigorously present any material claims and defenses. If Southwestern chooses to challenge the credibility of and its responsibility for each personal injury claim individually, then what may nominally be a class action initially would degenerate in practice into multiple lawsuits separately tried. We therefore conclude that Rule 42(b)(4)'s requirement that class treatment be superior to other avail-

able methods for a fair and efficient adjudication has not been satisfied.

Some commentators have urged that courts relax their commitment to individualized treatment of causation and damages in the mass tort context. *See, e.g.,* David Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 INDIANA L.J. 561, 567 (1987) (arguing that "bureaucratic justice implemented through class actions provides better opportunities for achieving individual justice than does the tort system's private law, disaggregative processes"); Samuel Issacharoff, *Administering Damage Awards in Mass–Tort Litigation,* 10 REV. LITIG. 463, 493 (1991) ("The legal system is now beginning to confront the conflict between idealized forms of case-by-case adjudication and the reality of injured parties' regularly dying before the litigation of their claims. Against this backdrop of justice routinely denied, proposals for rough-cut justice dispensed on a mass scale must be taken seriously."). Indeed, under intense pressure to manage their mass-tort dockets, some trial courts have dispensed with proof requirements for certain elements and sharply limited defendants' rights to contest plaintiffs' claims, only to be reversed on appeal. *See* Roger H. Transgrud, *Mass Trials in Mass Tort Cases: A Dissent,* 1989 U. ILL. L.REV. 69, 84–85 (illustrating how mass trials create incentives for improper behavior and decisions by trial judges). For example, in *Cimino v. Raymark Industries, Inc.,* 151 F.3d 297, 304 (5th Cir.1998), the trial court certified a class of 2,298 asbestos cases and implemented a trial plan in which the trial court planned to award damages for 2,128 cases based on an extrapolation of jury awards for 160 sample cases. Moreover, the trial court refused to allow defendants to contest exposure or causation for the 160 sample cases. *See Cimino,* 151 F.3d at 304–05 & n. 16. Instead, the trial court instructed the jury to assume that each plaintiff had sufficient exposure to be a producing cause of an asbestos-related injury. *See Cimino,* 151 F.3d at 304–05 &

n. 16. In short, defendants were not permitted to contest individual exposure or causation issues for any of the 2,288 nonrepresentative class members and the 160 sample cases. On an appeal from a judgment rendered in 159 of the cases, the Fifth Circuit reversed, holding that the trial plan violated defendants' Seventh Amendment rights and violated Texas's substantive law. *See Cimino,* 151 F.3d at 311–321; *see also Leverence v. PFS Corp.,* 193 Wis.2d 317, 532 N.W.2d 735, 739–40 (1995) (reversing judgment in which trial court, over defendants' objections, used aggregative procedures on issues of cause, contributory negligence, and damages in place of individualized jury determination).

Aggregating claims can dramatically alter substantive tort jurisprudence. Under the traditional tort model, recovery is conditioned on defendant responsibility. The plaintiff must prove, and the defendant must be given the opportunity to contest, every element of a claim. By removing individual considerations from the adversarial process, the tort system is shorn of a valuable method for screening out marginal and unfounded claims. In this way, "[c]lass certification magnifies and strengthens the number of unmeritorious claims." *Castano,* 84 F.3d at 746; *see also* John A. Siliciano, *Mass Torts and the Rhetoric of Crisis,* 80 CORNELL L.REV. 990, 1010–11 (1995); Francis E. McGovern, *Looking to the Future of Mass Torts: A Comment on Schuck and Siliciano,* 80 CORNELL L.REV. 1022, 1023–24 (1995) (both observing that mass tort cases have a tendency to attract many unmeritorious claims). If claims are not subject to some level of individual attention, defendants are more likely to be held liable to claimants to whom they caused no harm.

■ Finally, plaintiffs contend that denial of class treatment is, in reality, the complete denial of legal redress for many of the 904 plaintiffs, because many of their claims are simply too small to justify the cost of individual litigation. At oral argu-

ment, plaintiffs' counsel stated that "we have injuries that probably do not exceed, for any of the plaintiffs on an individual basis, a thousand dollars." Plaintiffs urge that the most compelling reason to certify a class action is the existence of a "negative value" suit, in which the cost of litigating each individual claim would surpass any potential recovery. *See General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 953 (Tex.1996); *Castano v. American Tobacco Co.,* 84 F.3d 734, 748 (5 th Cir.1996).

■■■ We do not second-guess plaintiffs' contention that, from a financial perspective, some claims may not be worth pursuing if class-action treatment is denied. But proceeding as a class action may very well cost more in the long run, if, as can be expected here, the class must ultimately be dissolved because there is no manageable way, fair to both parties, to resolve the individual issues. And "there is no right to litigate a claim as a class action. Rather, Rule 42 provides only that the court may certify a class action if the plaintiff satisfies the requirements of the rule." *Sun Coast Resources, Inc. v. Cooper,* 967 S.W.2d 525, 529 (Tex.App.—Houston [1 st Dist.] 1998, pet. dism'd w.o.j.); *accord Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 647 (Tex.App.—Houston [14 th Dist.] 1995, writ dism'd w.o.j.); *Vinson v. Texas Commerce Bank–Houston, N.A.,* 880 S.W.2d 820, 825 (Tex.App.—Dallas 1994, no writ). This class certification does not satisfy those requirements.

## VII

■■■ When properly applied the class action device is unquestionably a valuable tool in protecting the rights of our citizens. As the United States Supreme Court has stated:

> the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential

recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7 th Cir.1997)). But fairness and justice to all concerned require adherence to certification standards before a court may allow a case to proceed as a class action. *See General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 954 (Tex.1996).

We hold that the trial court's certification order was an abuse of discretion because common issues do not predominate. Because of this conclusion we need not consider Southwestern's other objections to the class action or trial plan. We reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

Justice BAKER filed a concurring opinion, in which Justice HECHT joined.

Justice ENOCH filed a dissenting opinion, in which Chief justice PHILLIPS and Justice HANKINSON joined.

Justice BAKER, joined by Justice HECHT, concurring.

I concur with the Court's opinion and with its conclusion that we have conflicts jurisdiction here because the court of appeals' opinion conflicts with *Transportation Insurance Company v. Moriel,* 879 S.W.2d 10 (Tex.1994). However, because the Court decided the conflicts issue on *Moriel,* the Court did not discuss *Iley v. Hughes,* 311 S.W.2d 648 (Tex.1958). I write separately because I believe that it is necessary to discuss *Iley* in the context of whether separate juries can try different elements of a personal injury claim in separate phases.

The court of appeals suggests that if it were necessary, the trial court could have multiple juries decide the individual issues in the trial's final phase. 960 S.W.2d at

297. This suggestion departs from *Iley*, in which this Court disapproved of allowing different juries to determine contested liability and damage issues in a personal injury claim. *See Iley*, 311 S.W.2d at 649.

Piecemealing personal injury litigation by having separate juries decide the common and individual issues works "a substantial change in the nature of the jury trial itself." 9 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2390, at 508 (1995). Such a procedure forces two juries to evaluate discreet issues out of context and without knowledge of all the evidence. This procedure can also lead to inconsistent verdicts between class members. Moreover, the common and individual issues may be so interwoven that the litigants would have to present much of the same evidence to both juries, wasting the court's time and the litigants' money. This is particularly true with splitting causation into general and specific components. One commentator has stated that mass trials on the issue of general causation create substantial savings only when the plaintiffs lose because this leads immediately to the dismissal of large numbers of mass tort claims. *See* Roger H. Trangsrud, *Mass Trials in Mass Tort Cases: A Dissent*, 1989 U. ILL. L.REV. 69, 79. This commentator observed that if the first jury finds general causation, for example, that the defendant's product could have caused the plaintiff's injury, individual trials will still be necessary, and therefore little or no time and expense is saved. *See* Trangsrud, 1989 U. ILL L.REV. at 79.

The Second Circuit Court of Appeals has also questioned the usefulness of deciding general causation without regard to specific causation:

> The relevant question ... is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g. state of health, lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 164–65 (2d Cir.1987).

It is true, as the court of appeals observed, that "the same considerations of long-standing policy and practice that inspired the Court's decision in *Iley*" are somewhat different "when approximately nine hundred plaintiffs seek to proceed as a class action." 960 S.W.2d at 297. But, in my view, having separate juries decide different phases of this personal injury case is not a viable option. First, the jury considering the trial's phase IV would need to consider general causation evidence to evaluate whether and to what extent the toxic smoke was the specific cause of a particular claimant's injuries. This would negate any savings that might be achieved by having the first jury decide general causation.

Second, the damage claims in this case, mental anguish and pain and suffering, are unliquidated. Our trial and appellate procedural rules prohibit separate trials of unliquidated damage claims when liability is contested. *See* TEX.R. CIV. P. 320; *see also* TEX.R.APP. P. 44.1.

Third, other courts share Texas's aversion to piecemeal litigation and its preference for unitary trials, particularly when personal injury claims are involved. *See, e.g., Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir.1996); *Cavender v. McCarty*, 198 W.Va. 226, 479 S.E.2d 887, 893–94 (1996) (Cleckley, J., concurring); *Brown v. General Motors Corp.*, 67 Wash.2d 278, 407 P.2d 461, 464 (1965).

Thus, for the reasons stated above, I would reject the court of appeals' suggestion of using separate trials by separate

juries in this case. In my view, *Iley's* rationale is an important consideration whenever a trial court must determine whether common questions of law or fact predominate over questions affecting only individual members and whether class treatment is "superior to other available methods for the fair and efficient adjudication of the controversy." Tex.R. Civ. P. 42(b)(4); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (discussing class actions that can be maintained under Federal Rule 23(b), on which Texas's Rule 42(b) is based); *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 (9 th Cir. 1976) (observing that certification under Federal Rule 23(b)(1)(A), the federal equivalent to Texas's Rule 42(b)(1)(A), will ordinarily be inappropriate in an action for damages).

I otherwise concur with the Court's opinion and judgment.

Justice ENOCH, joined by Chief Justice PHILLIPS and Justice HANKINSON, dissenting.

In some areas of the law, including class-action certifications, the Legislature has chosen to limit this Court's jurisdiction by making most interlocutory appeals final in the courts of appeals. Sometimes this has meant that cases that would otherwise merit our attention because they are important to the jurisprudence of the state are beyond our reach. This is such a case. But frustration at not being able to reach the merits of every important case is not a sufficient reason to fail to exercise judicial restraint. Thus, while I share the Court's desire to remedy significant errors in a published court of appeals' opinion, I nevertheless must dissent because we do not have jurisdiction to reach the merits of this class-certification order.

Under our conflicts jurisprudence, error is not the same as conflict. Decisions are in conflict, for purposes of this Court's conflicts jurisdiction, only when if issued by the same court, the later decision would overrule the earlier decision. Under this standard, the court of appeals' opinion in this case does not conflict with our decision in *Transportation Insurance Co. v. Moriel* [1] or any other case cited by the parties.

We have repeatedly emphasized how difficult it is to establish conflicts jurisdiction.[2] The test for such jurisdiction has long been whether "the rulings in the two cases are 'so far upon the same state of facts that the decision of one case is necessarily conclusive of the decision in the other.' " [3] For cases to conflict, it must be that "one would operate to overrule the other in case they were both rendered by the same court." [4]

The court of appeals' decision in this case does not conflict with *Moriel.* We held in *Moriel* that, if requested, a trial court should not permit the jury to hear evidence about punitive damages, including a defendant's net worth, before liability and actual damages have been submitted to the jury.[5] The Court supports its conflicts conclusion here with the observation that "the form of this lawsuit, per se, is not a material factual difference that distinguishes the principles we announced in *Moriel.* " [6] That may be so, but it has nothing to do with whether, had the same court issued both *Moriel* and the court of appeals' opinion here, the latter would

---

1. 879 S.W.2d 10 (Tex.1994).

2. *See Coastal Corp. v. Garza,* 979 S.W.2d 318, 319 (Tex.1998) (quoting *Gonzalez v. Avalos,* 907 S.W.2d 443, 444 (Tex.1995)).

3. *Gonzalez,* 907 S.W.2d at 444 (quoting *Christy v. Williams,* 156 Tex. 555, 298 S.W.2d 565, 567 (1957)), *quoted in Coastal Corp.,* 979 S.W.2d at 319.

4. *Id.* (quoting *Christy,* 298 S.W.2d at 568–69).

5. *Moriel,* 879 S.W.2d at 30.

6. 22 S.W.3d at 437 (citing Texas Rule of Civil Procedure 815 for the proposition that a class action cannot "enlarge or diminish any substantive rights or obligations of any parties to any civil action").

overrule the former. No plausible reading of the court of appeals' opinion would lead to that conclusion.

It is telling to compare the Court's discussion of *Moriel* to the court of appeals' rationale for why it modified the trial court's trial plan. How does the Court describe our holding in *Moriel*? Thusly: "a jury must decide liability and actual damages issues before it considers punitive damages."[7] And what did the court of appeals say about *Moriel*'s holding? Virtually the same thing: "*Moriel* clearly indicates that issues of liability and actual damages should be submitted to the jury first, and that punitive damages issues are to be presented to the jury only after liability and actual damages have been determined."[8]

And why did we so hold in *Moriel*? Because, the Court tells us today, punitive damages have to be proportional to actual damages: "In *Moriel* we were concerned that existing procedures failed to ensure that punitive damage awards 'are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages.'"[9] And why did the court of appeals determine in this case that the trial court's trial plan was an abuse of discretion? Because, the court of appeals told us in its opinion, punitive damages have to be proportional to actual damages: "The certification order in this case does not provide any mechanism for the jury to become familiar with the sort of actual damages present in this case prior to the jury's determination of punitive damages. Such an arrangement is prohibited ... because it provides no way for punitive damages to be reasonably proportional to actual damages."[10]

Under our conflicts jurisprudence, failure to properly apply a previously announced legal principle has never been understood, before today, to amount to a conflict. The Court claims that the court of appeals did more than merely err because we said in *Moriel* that " '[t]he standards we announce apply to *all* punitive damage cases tried in the future.' "[11] But this statement does not foreclose the possibility that *Moriel*'s standards might apply differently in some class actions than they apply in single-plaintiff-single-defendant cases. The court of appeals may have been wrong in its analysis, but it did attempt to apply *Moriel*'s holding to a procedural context not present in *Moriel*:

> [T]he trial court abused its discretion in devising a trial plan that would allow the jury to assess punitive damages before attaining any familiarity with the actual damages. A better plan, which we adopt as part of our judgment in this case, is to delay assessment of punitive damages until after actual damages for the class representatives have been proven. This plan still allows the jury to resolve the common issue of punitive damages relatively early in the litigation, but also allows the jury to have an understanding of the extent of actual damages suffered by a class before assessing punitive damages.[12]

The Court's rationale for claiming this *conflicts* with *Moriel* is actually the Court's analysis of how the court of appeals has *misapplied Moriel*:

> Under the court of appeals' modified order, the jury would decide punitive damages for the entire class without knowing the severity of the offense or the extent of compensatory damages, if any, for each of the 885 plaintiffs. The

---

7. *Id.* at 431.

8. 960 S.W.2d at 298 (citing *Moriel,* 879 S.W.2d at 30).

9. 22 S.W.3d at 433 (quoting *Moriel,* 879 S.W.2d at 29 (internal quotation omitted)).

10. 960 S.W.2d at 298 (citing *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981)).

11. 22 S.W.3d at 432 (quoting *Moriel,* 879 S.W.2d at 26 (emphasis added by the Court)).

12. *Id.* at 298–99.

certification order's provision to eliminate punitive damages for plaintiffs who are not able to prove actual damages may limit the harm to Southwestern. But the modified trial plan is nevertheless prejudicial because it fails to ensure that punitive damages are not grossly out of proportion to the severity of the offense for each of the 885 plaintiffs.[13]

Tellingly, the Court can't conclude that the court of appeals' decision would overrule *Moriel* had both been issued by the same court until it analyzes whether or not *Moriel* applies to class actions. We do not have jurisdiction here simply because the court of appeals guessed wrong on how we would apply *Moriel* in this very different context.

Nor do we have conflicts jurisdiction on any other ground Southwestern alleges. As the Court notes, Southwestern asserts that the court of appeals' opinion conflicts not just with *Moriel,* but also with *RSR Corp. v. Hayes*[14] and *Iley v. Hughes.*[15] It doesn't.

If our conflicts jurisprudence permitted us to go behind the court of appeals' opinion to search the record for a conflict, I might conclude differently about *RSR.* But in determining whether decisions are in conflict, we look only to the face of the opinions.[16] We cannot turn to the record, at the conflicts stage, to see what the evidence establishes. This is because section 22.225(b) of the Government Code makes the court of appeals the final arbiter of the facts and law in an interlocutory appeal, unless we have jurisdiction under section 22.225(c) or (d).[17] And if we were to look first to the merits of the case, concluding that it was wrongly decided, and therefore conclude that we have con-

flicts jurisdiction, we would be putting the cart before the horse. And that is what the Court does here.

I cannot conclude that the court of appeals' opinion conflicts with *RSR* because the court of appeals in this case failed to include a sufficient description of the factual allegations and the legal principles to be applied to those allegations from which I can determine a conflict. Of course, courts of appeals must include sufficient facts in their opinions to ensure that their decisions are subject to meaningful conflicts analysis. But while one may suspect that a conflict lurks beneath the opinion, such a suspicion does not establish conflicts jurisdiction here. Unless a case meets our rigorous test for a conflict, or there is a dissent from the court of appeals, we do not have jurisdiction over class-certification appeals until the Legislature decides to give it to us.

As for *Iley,* I conclude that it, too, does not afford us jurisdiction over this case. In *Iley,* we held that our rules of procedure did not permit "piecemeal trials," in which different issues in the same case are tried to different juries. Like *Moriel, Iley* was not a class action, and how its holding applies in the class context is an issue yet to be determined by this Court. Moreover, the court of appeals stated that it was not convinced that "more than one jury will be needed to try this case."[18] Of course, my personal doubt that so many claims could be presented to a single jury has nothing to do with whether we have conflicts jurisdiction. And in light of the different procedural context presented here, I can't say that the court of appeals' opinion here conflicts with *Iley.*

---

**13.** 22 S.W.3d at 433.

**14.** 673 S.W.2d 928 (Tex.App.—Dallas, writ dism'd w.o.j.).

**15.** 158 Tex. 362, 311 S.W.2d 648 (1958).

**16.** *See Coastal Corp.,* 979 S.W.2d at 320 ("With this understanding of our conflict jur-

isdiction in mind, we turn to whether the court of appeals' opinion in this case conflicts with *RSR* . . . .").

**17.** Tex. Gov't Code § 22.225(b).

**18.** 960 S.W.2d at 297.

We do not have conflicts jurisdiction in this case. Therefore, I dissent.