

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00060-CV

GLENCREST RESOURCES, LLC                    APPELLANTS
AND LEONARD EDWARD
BRISCOE, JR., DORIS BRISCOE,
AND ROSANNA BRISCOE, AS
HEIRS TO THE ESTATE OF
LEONARD BRISCOE, SR.

V.

PAMELA ELLIS, INDIVIDUALLY                    APPELLEE
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED

----------

### FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In this interlocutory appeal,[2] appellant Glencrest Resources, LLC complains that the trial court erred by certifying this case as a class action.

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3) (West Supp. 2012).

Appellants Leonard Edward Briscoe Jr., Doris Briscoe, and Rosanna Briscoe, as heirs to the estate of Leonard Briscoe Sr. (collectively, the Briscoe defendants) complain that the trial court erred by failing to dismiss them from the suit. We overrule the Briscoe defendants' issue, and we vacate the trial court's class certification order and remand the case to the trial court for further proceedings.

**Background Facts**

In 2005 and 2006, oil and gas companies were vigorously pursuing oil and gas leases for land in the Barnett Shale region of Forth Worth. Some residents felt that they lacked the knowledge and bargaining power necessary to obtain desirable lease terms. At the request of the Glencrest Neighborhood Association, Glencrest Resources, LLC (Glencrest) was created to "represent the neighborhood association in trying to put together a lease package or an overall lease deal for the entire neighborhood." Briscoe Sr. was the manager of Glencrest, and his son, Briscoe Jr., helped his father run the organization.

Once formed, Glencrest put up flyers in the neighborhood regarding informational meetings and stating that Glencrest was offering a $3,000 bonus payment per acre with a $750 minimum bonus payment for land less than one acre. The flyers advertised that this was the "[b]est financial offer in the market" and the "[b]est protection against fraud and abuse."

Briscoe Jr. estimated that there were about a hundred neighborhood meetings. Landowners listened to the presentation, asked questions, and then moved to the back of the meeting space to sign the leases. Roughly 3,100

2

landowners signed leases at the meetings. No title checks were performed at the time of the signings. The leases themselves do not make reference to the bonus payment. None of the flyers or any other written communication to the landowners set out the bonus payment agreement other than the amount of bonus per acre.

Pam Ellis attended a meeting on December 5, 2006. Ellis testified that Briscoe Sr. told the landowners "something about the ones that signed on, their property had to be surveyed for the size of the property so they would know the amount of bonus to pay and that that would take several weeks." She testified that her understanding from Briscoe Sr.'s speech was that she would be paid her bonus "within several weeks." She testified that people asked Briscoe Sr. when they would get their money and his response was, "We need time to survey your property according to the size to know how much bonus to pay." She also testified that there were no documents that said in what time period the bonuses would be paid. After the meeting, she signed the lease with Glencrest. When she was not paid after about six weeks, Ellis called Briscoe Sr. He told her that "the check was in the mail."

It is undisputed that at the time of the meetings, Glencrest did not have the money to pay the bonuses. David Drumm, an attorney at Carrington Coleman, the firm that represented Glencrest during this period, testified, "We knew we couldn't pay the bonuses then, and made it clear, to my understanding, to the people we couldn't pay it right then." Glencrest expected to have the money

3

soon, but ended up not having the financial ability to pay bonuses until May 2008.

In May 2008, Glencrest sent letters to landowners and made phone calls letting the landowners know that their bonus payments were available.[3] On weekdays, Glencrest operated an office where people could get their bonus payments, and on Saturdays, the company worked out of a church. When they arrived, landowners had two options: they could ratify their original three-year lease and get a $3,000 per acre bonus, or they could amend their lease for a longer five-year primary term and get a $6,500 per acre bonus. Briscoe Jr. explained,

> We told individuals that if they had a three-year lease, that would be what was called just a reinstatement and then a ratification. But then the main focus of the conversation was to explain the best offer, which was the one that had the most money, which was the $6,500 per acre lease. In those conversations, I've only had three people that I can recall that wanted the $3,000 per acre bonus. We paid it to them. And they then ratified and reinstated their three-year lease.

Roughly 1,000 to 1,300 of the initial lessors signed a ratification and amendment to a five-year primary term with the higher bonus. Drumm testified that "not more than" twenty-five people opted not to extend their lease to the five-year term and took the original bonus offer. Briscoe Jr. testified that he only

---

[3]Ellis did not receive a letter or a phone call about the bonuses because she was represented by counsel. An attorney at Carrington Coleman testified that they sent a letter to Ellis's attorney, but Ellis testified that she did not find out that Glencrest was paying bonuses until about a month before the class certification hearing held in August 2011.

knew of three people who chose to take the smaller bonus. Another approximately 1,307 of those original lessors either had top leases[4] or competing leases, which prevented them from ratifying and prevented Glencrest from paying the bonus. A few people refused to take their bonus altogether. One man filed a lawsuit against Glencrest. Another demanded to be released from the lease, which Briscoe Jr. granted. The Glencrest office was open until roughly April 2009.

On October 30, 2007, Ellis filed this suit. She alleged that "Briscoe[] Sr. represented that if Plaintiff and the other homeowners who attended the meeting signed the proposed oil, gas, and mineral lease that evening, they would get their bonus payment within 30 to 45 days." She sued for fraudulent inducement and breach of contract. Ellis later filed a motion for class certification, seeking to certify the class as "Any person who, from January 1, 2006 through April 30, 2008, entered into an oil, gas, and mineral lease with Defendant Glencrest . . . , and has not received a bonus payment." Ellis estimated that about 1,000 of the lessees would be members of the class.

Glencrest responded to the motion for class certification by arguing that the contracts were executed at different times and under different circumstances, and that individual issues predominate over common issues. It identified various

---

[4]A "top lease", Drumm explained, is "a lease that recognizes it's a subordinate lease and says . . . it's a lease subject to the termination of the prior lease."

individual issues to include "whether title problems existed that prevented performance, whether a particular plaintiff engaged in action that prevented performance, whether Defendants offered performance, whether a particular Plaintiff had signed with more than one contractor, [or] whether a particular Plaintiff was offered performance but refused because they changed their mind . . . ." It argued that "plantiffs' vague allegations in their petition of a 'common course of conduct' do not relieve the plaintiffs of their burden to demonstrate that common issues predominate."

Ellis filed special exceptions to Glencrest's response, which the trial court granted. Ellis also filed a motion for sanctions for alleged discovery abuses committed by Glencrest, which was denied. Glencrest filed an amended response.

The trial court granted class certification, defining the class as "Any person who, from January 1, 2006 through April 30, 2008, entered into an oil, gas, and mineral lease with Defendant Glencrest . . . , and has not received a bonus payment" excluding "individuals that during the effective date of the primary term signed top leases or competing leases with third-party companies/individuals" and "individuals that were actually paid the $3000 bonus for the three-year primary term lease or had title issues that would have prevented them from actually conveying what was part of the oil, gas, and mineral lease" and "individuals who signed an amendment ratification for a five-year primary term

6

with a different bonus sometime after they signed the original three-year primary term lease." The elements of the class claim were listed as

1. Was there an offer by [Glencrest] to pay landowners a bonus payment of $3,000.00 per acre, with a minimum of $750.00, in exchange for consideration of execution of an Oil, Gas[,] and Mineral Lease in favor of [Glencrest]?

2. Did the landowner accept this offer?

3. Did [Glencrest] receive the consideration of an executed Oil, Gas[,] and Mineral Lease called for in the offer?

4. Did [Glencrest] breach the contract by not paying the promised bonus payment? and

5. Did the landowner suffer damages as a result of this breach?

At the class certification hearing, Ellis reurged her motion for sanctions and filed her second motion for sanctions, arguing that Glencrest flaunted and disobeyed discovery deadlines and withheld responsive documents. The trial court granted Ellis's motions for sanctions, striking "any defenses to class certification raised by pleadings filed after June 10, 2011 or evidence tendered after June 17, 2011." Glencrest and the Briscoe defendants then filed this appeal.

## Class Actions

Class action certification in Texas is governed by Texas Rule of Civil Procedure 42.[5] *See* Tex. R. Civ. P. 42. At the certification stage, the plaintiffs

---

[5]The rule is patterned after Federal Rule of Civil Procedure 23; consequently, federal decisions and authorities interpreting current federal class

7

have the burden of establishing their right to maintain an action as a class action. *Life Ins. Co. of Sw. v. Brister*, 722 S.W.2d 764, 770 (Tex. App.—Fort Worth 1986, no writ), *overruled on other grounds by Bernal*, 22 S.W.3d at 435. In order to have a class action certified under Rule 42, it is necessary for a claimant to satisfy all the requirements of Rule 42(a) and at least one provision of Rule 42(b). Subsection (a) requires that

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Tex. R. Civ. P. 42(a). Ellis sought certification under the third provision of subsection (b), which states that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Tex. R. Civ. P. 42(b)(3). The non-exhaustive factors the trial court should consider in this determination are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

---

action requirements are persuasive authority. *Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000).

8

concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  Tex. R. Civ. P. 42(b)(3)(A)–(D).

### Standard of Review

The appellate review standard for a class certification order is a modified abuse of discretion.  *Bernal*, 22 S.W.3d at 439.  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.  An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

As the supreme court has explained,

> In *Bernal,* we expressly stated that the trial court's decision to certify a class was to be reviewed for an abuse of discretion, but we likewise expressly refused to indulge every presumption in favor of

9

the trial court's ruling. A trial court has discretion to rule on class certification issues, and some of its determinations—like those based on its assessment of the credibility of witnesses, for example—must be given the benefit of the doubt. But the trial court's exercise of discretion cannot be supported by every presumption that can be made in its favor. As we said in *Bernal*, "actual, not presumed, conformance with [the rule] remains . . . indispensable." Compliance with Rule 42 must be demonstrated; it cannot merely be presumed.

*Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002).

## Discussion

In its second issue, Glencrest argues that the trial court abused its discretion by certifying the class because Ellis failed to demonstrate that issues common to the class predominate over individual issues. Because the predominance requirement of Rule 42(b)(3) is one of the most stringent prerequisites to class-action certification, we consider first whether it was rigorously applied in the trial court. *See Bernal*, 22 S.W.3d at 434–35; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622, 117 S. Ct. 2231, 2249 (1997). The predominance requirement prevents class certification when complex and diverse individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present otherwise viable claims or defenses. *Henry Schein*, 102 S.W.3d at 690; *Bernal,* 22 S.W.3d at 434. Certification is not appropriate unless it is determinable from the outset that the individual issues can be considered in a manageable, time-efficient and fair manner. *Henry Schein,* 102 S.W.3d at 688 (citing *Bernal,* 22 S.W.3d at 435). "The test for predominance is not whether common issues outnumber

10

uncommon issues but . . . whether common or individual issues will be the object of most of the efforts of the litigants and the court." *Bernal,* 22 S.W.3d at 434 (quoting *Central Power & Light Co. v. City of San Juan,* 962 S.W.2d 602, 610 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.)). To evaluate predominance, we identify the substantive issues that will control the litigation, assess which issues will predominate, and determine if the predominating issues are, in fact, those common to the class. *Id*.

In performing our analysis, we bear in mind that it is the plaintiff's burden to establish compliance with all prerequisites to certification. *See Methodist Hosps. of Dallas v. Tall*, 972 S.W.2d 894, 897 (Tex. App.—Corpus Christi 1998, no pet.); *Brister*, 722 S.W.2d at 770. That is, the plaintiff must offer evidence demonstrating compliance with each requirement. But she is not required to "make an extensive evidentiary showing." *Tall*, 972 S.W.2d at 897.

## 1. What are the substantive issues?

This is a breach of contract case;[6] thus, those issues bearing on the elements of the purported class's claim will be the substantive issues. The elements of written and oral contracts are the same and must be present for a contract to be binding. *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555–56 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The following elements are required for the formation of a binding contract: (1) an offer, (2) acceptance in

---

[6]Ellis nonsuited all of her other causes of action against Glencrest, including her fraudulent inducement claim.

11

strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Id.*

Ellis argues that one of the terms of the offer was that payment would be performed in a certain amount of time. Although she underplays the importance of this term of the offer, she does not dispute that Glencrest began offering payments to lessors whom it was able to contact in May 2008,[7] that an offer of payment was sent to her via her attorney, and that Glencrest actually paid roughly 1,300 lessors. Thus, in order for there to have been a breach of the contract as Ellis contends, it must have been that Glencrest did not offer payment to Ellis and the other class members *in the time agreed by the parties to the contract.*[8]

---

[7]Ellis implies that Glencrest's requirement that lessors sign either an extension or a ratification of their original lease is somehow a breach of the original agreement to pay the bonus. However, Ellis does not dispute that all parties who signed the extension or ratification were paid. Thus, this issue does not bear on the discussion of whether a time frame for payment was a term of the agreement.

[8]Ellis's pleadings and her motion for class certification state that she was told that she would receive her bonus within thirty to forty-five days. *See Am. Nat'l Ins. Co. v. Cannon*, 86 S.W.3d 801, 809 (Tex. App.—Beaumont 2002, no pet.) ("The issues, as broadly worded, include the claims made in plaintiffs' pleadings."). Ellis's testimony at the hearing was

> Q. Then, to your understanding, was the agreement and the contract you entered into with Glencrest Resources, LLC, that if you signed the three-year primary term lease for the $3,000 bonus or pro rata thereof that *within several weeks that you would be paid the bonus money*?

Glencrest's complaint that the trial court struck its evidence of defenses as to the class certification does not prohibit it from presenting those defenses at trial.[9]  *See Bernal*, 22 S.W.3d at 435 ("[I]t is improper to certify a class without knowing how the claims can and will likely be tried.").  Thus, we must consider those defenses in determining whether they will be substantial issues in the case.  *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("An affirmative defense is not *per se* irrelevant to the predominance inquiry.").  One of Glencrest's defenses is that for some purported class members, there was some fault or act on the lessor's behalf that prevented Glencrest from completing payment.  For instance, it argues that there may be issues with the landowner's ability to demonstrate good title, that the landowner could not be contacted, or that the landowner refused payment or repudiated the contract.  Glencrest also argues that the flyers advertising the meetings and the presentation made at the meetings were not offers which landowners could accept by signing the lease but rather signing the lease was an offer by the landowners which Glencrest could accept by paying the bonus.

---

A. That was my understanding.  [Emphasis added.]

Ellis's expert Edward F. Sherman also testified that the contract included "promises that certain things would be done within a certain period of time," and that under the terms of the agreement, payment was due "before the expiration of the lease period."

[9]The trial court's order granting Ellis's motion for sanctions struck only Glencrest's "defenses to class certification," not their defenses to Ellis's cause of action.

13

## 2. Which of the substantive issues will predominate?

It is undisputed that the only documents discussing any of the terms of the bonus payment were the flyers posted in the neighborhood advertising a $3,000 bonus payment per acre with a $750 minimum bonus payment for land less than one acre.[10] The amount of the bonus is therefore not a predominate issue. Neither does Glencrest contest that it owes a bonus to everyone who signed a lease and qualifies for payment. *See Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 389–90 (N.D. Tex. 2009) (acknowledging that because it was undisupted that "when the facts show that a refund is warranted, Chicago Title must give the refund," that issue was not the question that would predominate at trial), *aff'd sub nom. Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011).

---

[10]Ellis testified,

> Q. W[ere] there any documents to say what time period that the bonus on the paper would be paid?
>
> A. Was there anything written?
>
> Q. Yes, ma'am.
>
> A. No, just voiced.

Drumm testified,

> Q. Was any published information made available to lessors that if they showed up at these meetings in the summer of '08 that they would be paid their $3,000 if there was clear title?
>
> A. No.

What will predominate are the issues that are disputed by the parties. The trial court found that "[t]he issue that will be the object of most of the efforts of the litigants and the court will be the determination of the breach of contract claims." That includes what the precise terms of the oral contract were (importantly, the terms regarding the timing of paying the bonuses and what acts constituted the offer and the acceptance),[11] whether particular landowners qualified for payment but were denied it, and any defenses Glencrest presents regarding reasons for nonpayment. These are the issues that will entail much evidence and testimony, and it is these questions that will be the object of much of the efforts of the litigants and the court. *See Bernal*, 22 S.W.3d at 434.

---

[11]Ellis's expert Sherman argues that the terms of consideration were that Glencrest would pay the bonus for the execution of a contract, not that Glencrest would pay the bonus in exchange for the landowner's oil and mineral rights. Sherman opined that this is a simple breach of contract suit based on the agreement by Glencrest to pay the bonus to anyone who signed a lease, even if they did not own the rights at that time. As he testified, "Even as to those individuals, if there are title issues, they still are entitled to payment of the bonus." He claims that the contract was complete, and the bonus payment due, at the moment the lessor signed the contract, despite the lack of steps taken to ensure that the lessor possessed the oil and mineral rights to his land. Sherman's interpretation extends the scope of Glencrest's responsibility to pay a bonus to include invalid contracts. That is, Sherman would have Glencrest pay any lessors who signed a contract, even if they did so knowing that they did not possess the rights which they purported to convey to Glencrest. Sherman also asserted that later conduct, such as a top lease, would not affect the completed contract and Glencrest's obligation to pay. Even Ellis admits that those lessors who do not possess clear title to the oil and mineral rights on their land should not be included in the class.

15

### 3. Are the predominate issues common to the class?

The class certification order states, "Whether the offer was made by [Glencrest] uniformly to all class members; the class members' acceptance by signing identical leases as called for in the offer as consideration; consideration; and the alleged lack of payment are common to all of the class members." When a class action is based on an oral contract, the terms of the oral contract must be proven to be substantially similar by proving that the defendant engaged in a "common course of conduct." *See Nissan Motor Co. v. Fry*, 27 S.W.3d 573, 588 (Tex. App.—Corpus Christi 2000, pet. denied) ("The commonality requirement is generally considered satisfied where (1) many members of the class are subject to the same misrepresentation or omissions by reason of common documents, or (2) the defendant is alleged to have engaged in a common course of conduct."); *Adams v. Reagan*, 791 S.W.2d 284, 289 (Tex. App.—Fort Worth 1990, no writ). "[C]lass-wide proof is possible when class-wide evidence exists." *Henry Schein*, 102 S.W.3d at 693–94. However,

> [i]nescapably individual differences cannot be concealed in a throng. The procedural device of a class action eliminates the necessity of adducing the same evidence over and over again in a multitude of individual actions; it does not lessen the quality of evidence required in an individual action or relax substantive burdens of proof.

*Id*. Thus, the purported class must *demonstrate* the common course of conduct to meet its burden; it is not enough to merely allege it. *See Snyder Commc'ns, L.P. v. Magaña*, 142 S.W.3d 295, 301 (Tex. 2004) ("The plaintiffs' vague allegation in their petition of a 'common course of conduct' and Magaña's brief

16

testimony that an unidentified Snyder officer told her there was a commission problem 'in the whole company' do not relieve the plaintiffs of their burden to demonstrate that common issues predominate."); *see also Hancock*, 263 F.R.D. at 388 ("A class plaintiff cannot merely point to a 'common course of conduct' without also demonstrating 'whether the common course of conduct provide[s] a class-wide basis for deciding the predominant class issues of fact and law.'") (quoting *Gene & Gene,* 541 F.3d at 326); *Bernal*, 22 S.W.3d at 435 ("Given the plaintiffs' burden, a court cannot rely on mere assurances of counsel that any problems with predominance or superiority can be overcome.") (quoting *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996)). Demonstrating predominance in a case involving oral representations is a very difficult task, and many courts have refused to certify a class when oral statements have not been proven to be uniform. *See Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993) (holding that putative class failed to demonstrate a common course of conduct when they did not show that the alleged communications were identical or "uniformly made at every seminar"); *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307–08 (5th Cir. 1977) *cert. denied*, 436 U.S. 932, 98 S. Ct. 2832 (1978) (noting that "the district court may quite properly refuse to certify a class on the grounds that common questions of law or fact do not predominate" when a plaintiff cannot demonstrate that oral statements were "uniform, e.g., through use of a standardized sales pitch by all the company's salesmen"); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482

F.2d 880, 883 (5th Cir. 1973) (holding that a class action could not be sustained because the plaintiff "fail[ed] to prove any standardized representations" by the defendant); *Cannon*, 86 S.W.3d at 809 ("What each class member in this case was told regarding monies owed under the advance agreements . . . would require individual determination."); *Spector v. Norwegian Cruise Line Ltd.*, No. 01-02-00017-CV, 2004 WL 637894, at *7 (Tex. App.—Houston [1st Dist.] Mar. 30, 2004, no pet.) (upholding trial court's order denying certification when the breach of contract claim "could require individual inquiries to the extent that oral representations might have formed some or all of a class member's contract"); *Stobaugh v. Norwegian Cruise Line Ltd.*, 105 S.W.3d 302, 307 (Tex. App.— Houston [14th Dist.] 2003, no pet.) (holding that the putative class did not establish predominance when the class members could not point to "evidence in the record showing that these alleged oral misrepresentations were the same or similar among the proposed class members"); *Ways v. Imation Enters. Corp.*, 214 W. Va. 305, 314 (2003) ("Because the bulk of the appellants' breach of contract claims rests upon alleged individual oral representations made by various members of management, . . . individualized evidence as to the specific circumstances surrounding the alleged promises is required.").

Ellis claims that the fact that the written leases are identical "evidenc[es] that the landowners accepted the same offer." However, as we noted above,

18

and as explained by Ellis's own expert,[12] the purported class's cause of action is not for a breach of the lease, and some terms of the bonus payment offer were only communicated orally. Drumm testified that there were hundreds of group meetings and "maybe a few" one-on-one meetings in which the terms of the lease and the bonus payment were discussed with landowners. Ellis went to only one of those meetings. She testified that she did not know anyone at that meeting and has made no attempt to contact anyone who attended the meetings. Ellis was the only witness testifying on behalf of the purported class who attended the meetings. Glencrest offered the testimony of Lias Young, another landowner, who attended "at least two or three" of the meetings. Young testified that at the meetings he attended, he was never told a time period in which the bonus would be paid. Briscoe Jr. testified that he and Briscoe Sr. explained to the landowners at the meetings that Glencrest did not have the money to pay the bonuses at the time the leases were signed. He said,

> Sure, we told—I told them that. I've got a real estate license. I better have told them.

> Q. Why do you say you better have told them?

---

[12]Sherman testified,

This suit is not for a breach of the lease. The lease provides certain responsibilities regarding drilling, for example, that the defendant is required to carry out. The suit is not alleging breach for the drilling responsibilities, for example, or the payments of royalties pursuant to drilling. This suit is limited to the agreement to pay a bonus.

19

A. Because as a real estate license holder, I come up under certain rules and requirements. One of those are, if I, through my acts and statements, cause someone to take an action concerning their property and they lose—lose money, per se [*sic*]—then I could lose my license. I also could be sued, held for misrepresentation, fraud, could be criminal.

Drumm, who did not attend the informational meetings with the landowners, testified that Glencrest's "communication plan" was,

"that everybody in the community would understand that this is the way to get a fair shake for the community and that the bonus would have to be delayed until we could find a funding source for the bonus. But it would result in a higher bonus than if they went out and just took what was available on the market at the time."

He admitted that he did not know whether the plan was communicated correctly, but his understanding is that Glencrest "made it clear. . . to the people [that] we couldn't pay it right then."

Sherman testified, "[I]t's not relevant that it was not contained in the lease if there is adequate evidence—and it appears to be there clearly is in this case—that there was an oral understanding made at these six or so meetings in churches, of which there's ample evidence of everyone saying that's exactly what the deal was." It is unclear what evidence Sherman is referring to when he speaks of the "ample evidence" of the statements made at the meetings.[13] If Ellis

---

[13]Sherman testified that he reviewed "the pleadings, discovery, and other documents." His testimony was videotaped prior to the hearing, so he did not hear any of the other witnesses' testimony. It is also unclear why he believed there were only "six or so" meetings. Ellis offered into evidence seven different flyers advertising the meetings. Five of those flyers advertised sixteen specific meeting days. Two flyers advertised meetings "every Friday" "until further

had such evidence, she did not present it at the hearing. The evidence of what was said at the meeting was Ellis's testimony that she would be paid in several weeks, Briscoe Jr.'s testimony that he notified the landowners before they signed the leases that Glencrest did not have the funding to pay the bonuses at that time, Drumm's testimony that the plan was that they would convey to the lessors that payment would have to wait until funds were found, and Young's testimony that he was not told at the meetings he attended when the bonuses would be paid. This is hardly ample evidence of any consistent agreement.[14] Sherman's

_____

notice," and another listed locations for meetings on every weekday without dates.

[14]In fact, Ellis's own testimony was not that Briscoe Sr. told the lessors that their bonuses would be paid within a few weeks. Instead, Ellis inferred the few-week period from Briscoe Sr.'s statements that the title check would take a few weeks. She was asked,

> Q. Were you told when you would receive that sign-on bonus money?
>
> A. He mentioned something about the ones that signed on, their property had to be surveyed for the size of the property so they would know the amount of bonus to pay and that that would take several weeks.

And later she was asked,

> Q. Do you remember some of the questions that were asked during the presentation?
>
> A. The main question was, "When do we get our bonus money?"
>
> Q. And did you hear the response?

21

contention that "[t]he fact that the leases were signed at different places, times, and circumstances has nothing to do with" establishing a class cannot be true when essential terms of the agreement were only made orally on numerous occasions to different groups of people.

To determine whether the terms of the agreement were uniformly presented to the putative class or whether Glencrest engaged in a common course of conduct, it may not be necessary to present testimony from every class member. However, it is most certainly necessary to present evidence that at least more than one person understood that the terms were what Ellis alleges they were. Here, there is simply no evidence than anyone other than Ellis believed the bonus payments were due within thirty or forty-five days of signing the lease. To put it another way, the trial court's finding that "[w]hether the offer was made by [Glencrest] uniformly to all class members . . . [is an issue] common to all of the class members" is not supported by any evidence that if that question were asked of all the class members, their answers would be the same. "Merely asking the same questions across a spectrum of thousands of potential plaintiffs does not satisfy the strictures of" the class certification rule. *Hancock*, 263 F.R.D. at 388. "For a question to be a common substantive issue that predominates, it must be definitely answered for all class members using a generalized set of facts and producing one unified conclusion." *Id*. at 390.

---

A. It was, "We need time to survey your property according to the size to know how much bonus to pay."

22

Simply pointing to common issues does nothing to address the predominance issue. In this case, Ellis has pointed to a "common course of conduct" without demonstrating a common course of conduct that actually provides a classwide basis for deciding the predominant issues of fact and law. Each class member's understanding of when the bonus would be paid, which must be based on the presentation at the neighborhood meetings, is inescapably a predominate issue. Yet Ellis's testimony establishes only her understanding and no one else's. She did not meet her burden to bring classwide proof to decide the predominance issue. Because Ellis has presented no classwide proof from which the factfinder could ultimately determine whether Glencrest breached an oral agreement to pay the bonus within a specific timeframe, Ellis has not shown that the predominance requirement is satisfied. Because predominance has not been established, the trial court abused its discretion by certifying the class. We sustain Glencrest's second issue. Because we sustain Glencrest's second issue, we do not reach its other issues, which address other grounds for decertifying the class. *See* Tex. R. App. P. 47.1.

### The Briscoe defendants

In their issue on appeal, the Briscoe defendants argue that the trial court abused its discretion by failing to dismiss them from the suit, and they ask that this court reverse the trial court's order against them. They also argue in this same issue that Ellis has not provided legally sufficient evidence to prove that they are liable in their personal capacity. However, the Briscoe defendants have

23

not directed us to a finding or ruling by the trial court to review, either for an abuse of discretion or for legal sufficiency, nor have we found one.

Rule 33.1 of the Texas Rules of Appellate Procedure requires that the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court, if the specific grounds were not apparent from the context; and (2) the trial court ruled on the request, objection, or motion, either explicitly or implicitly, or refused to rule on the request, objection, or motion, and the complaining party objected to the refusal. Tex. R. App. P. 33.1(a). A complaint regarding the legal insufficiency of the evidence may be made for the first time on appeal. *See* Tex. R. App. P. 33.1(d).

We assume the Briscoe defendants are appealing from the order granting Ellis's motion and supplemental motion for class certification because that is the only order they appended to their appellate brief. However, there are no findings or rulings by the trial court regarding the dismissal of the Briscoe defendants in that order. Further, the Briscoe defendants did not challenge the motions for class certification on the ground they now raise on appeal. In fact, the only instance we found in the record in which the Briscoe defendants raised the issue

of dismissal at all was in their First Amended and Supplemental Answer with Affirmative Defenses.[15]

There is no ruling by the trial court regarding the Briscoes' dismissal from the suit in the record before us. *See Hull v. Davis*, 211 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding that appellant failed to preserve complaint that trial court failed to rule on his motion when no motion or ruling on any such motion was found in the record). There is no motion for dismissal or for summary judgment filed by the Briscoe defendants in the record before us. If the Briscoe defendants wished to seek dismissal from the suit, they must have requested that relief from the trial court first. *See Ctr. For Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) (refusing to address on appeal grounds for dismissal that were not raised to the trial court in a motion to dismiss). It is not enough that the Briscoe defendants merely pleaded affirmative defenses that they alleged warranted their dismissal from the case; they were required to move on those defenses before we may address them on appeal. *See* Tex. R. Civ. P. 166a(b) (requiring defendant seeking summary judgment on the claims against him to move for summary judgment on those claims). Because there is no ruling by the trial court, we overrule the Briscoe defendants' issue.

---

[15]In its order granting Ellis's motions for sanctions, the trial court struck any defenses to class certification raised by pleadings filed after June 10, 2011. The Briscoe defendants filed their amended answer on August 1, 2011.

## Conclusion

Having sustained Glencrest's dispositive issue and overruled the Briscoe defendants' issue, we vacate the trial court's class certification and remand the case to the trial court for further proceedings consistent with this opinion.


                          LEE GABRIEL
                          JUSTICE

PANEL:  LIVINGSTON, C.J., MEIER and GABRIEL, JJ.

DELIVERED:  August 16, 2012