**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00454-CV**

_____

**TEXAS A&M UNIVERSITY 12TH MAN FOUNDATION, Appellant**

**V.**

**NATHAN HINES, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED, Appellees**

**On Appeal from the 1A District Court
Newton County, Texas
Trial Cause No. CV-1814312**

**MEMORANDUM OPINION**

In this case, the plaintiff, Nathan Hines,[1] filed suit claiming the Texas A&M University 12th Man Foundation (the Foundation) breached contractual promises to its donors who donated money to the Permanently Endowed Scholarship Program, a program used to fund athletic scholarships at Texas A&M.[2] After Hines sued, he

---

[1]According to Supplemental Briefing filed by the parties, Nathan Hines died in 2020, after the appeal was filed.

[2]Originally, the Foundation was "the Aggie Club."

1

asked the trial court to certify a class of similarly situated individuals so the suit could proceed as a class action under Rule 42.[3] After the trial court granted the motion, the Foundation challenged the trial court's order certifying the suit as a class action by filing an interlocutory appeal.[4]

In the appeal, we must decide two questions: (1) whether questions common to members of the putative class predominate over questions affecting only individual members of the class; and (2) whether allowing the suit to proceed as a class action suit is the superior method to fairly and efficiently resolve the parties' dispute.[5]

We conclude the answers to those questions is no, so we reverse the trial court's order certifying the class, as more fully explained below.

### Factual Background

The record shows the Foundation, a non-profit, is an affiliate of Texas A&M University. The Foundation performs two basic functions for the University. First, it raises funds for the University's athletic programs. Second, it manages ticket and parking sales for University athletic events. Simply put, while the Foundation is operated as a non-profit, alumni, students, and fans purchase tickets from the Foundation to attend University athletic events, and they may donate money to the

---

[3]Tex. R. Civ. P. 42 (Class Actions).
[4]Tex. Civ. Prac. & Rem. Code. Ann. § 51.014(a)(3).
[5]Tex. R. Civ. P. 42(b)(3).

Foundation to support scholarships, awarded by Texas A&M, to athletes who attend Texas A&M University.

Beginning in the 1970s, the Foundation created the Permanently Endowed Scholarship Program (the Program). The Program was used over several decades to fund athletic scholarships that were awarded to athletes by the University. In return for making large donations in designated amounts to the Program, Hines alleged the Foundation promised donors priority seating and parking, benefits otherwise unavailable to members of the Foundation that did not participate in the Program. According to Hines, these benefits were contractual and offered in return as a quid pro quo benefit for endowing an athletic scholarship awarded by the Program.

When the Program ended, hundreds of individuals had become endowed donors. By order, the trial court certified these individuals as the putative class.[6] For his part, Hines (the putative class representative) endowed two athletic scholarships awarded by the Program. The first was a scholarship that he endowed beginning with payments that he began making in 1989. The second was a scholarship he endowed beginning with a single payment, paid in full in 1992.

According to Hines, he made the 1989 endowment pursuant to an oral agreement that he made with Harry Green, the Foundation's executive director in 1989. Under the 1989 agreement, Hines alleged he agree to donate to the Program

---

[6]The *Permanently Endowed Scholarship Program* ended in the 2000s.

3

in return for two benefits: First, he promised to endow the scholarship in return for the Foundation's promise to provide him with tickets to the best seats available to the Foundation for all home and away football games for the rest of Hines' and his wife's lives; Second, in return for the same donation, the Foundation (through Green) promised it would provide Hines the right to park in the best locations available to the Foundation at all home games for the rest of Hines' and his wife's lives.

According to Hines, he made a similar arrangement with the Foundation's executive director Frank Shannon in 1992 when agreeing to endow a second athletic scholarship under the Program. When Hines asked the trial court to certify his suit as a class action, he presented evidence showing the Foundation orally agreed to terms similar to the terms he reached with the Foundation with several other members of the Foundation. In 1992, however, the Foundation changed it policies, and began reducing any new agreements on any newly endowed scholarships in the Program to writing. Second, that same year the Foundation quit offering prospective donors complimentary tickets to football games; instead, it began to offer prospective donors the right to purchase tickets to games at face value, even though the tickets the Foundation offered would be located where those prospective donors preferred to have their seats. Third, none of the prospective donors were offered

benefits for life; instead, under the revised policies of the Foundation, the Foundation made its benefits subject to a defined thirty-year term.[7]

Since the Foundation changed its policies over the years, and went from oral to written policies too, members of the putative class have both written and oral policies, so different members of the class have different terms that apply to their contracts depending on what year the endowed donor created the athletic scholarship under the Program at Texas A&M. Even so, Hines argues, a common thread runs through the class claims. The thread that he asserts is common is that the Foundation represented seating and parking privileges made available to the endowed donors would be in the best locations available to the Foundation at no additional charge. For convenience, we refer to Hines' theory about his common benefit as his "best-benefits claim."

On appeal, Hines agrees there is nothing in the record that documents, in writing, the fact that the Foundation promised all members of the putative class that each would receive a best-benefits claim by becoming an endowed donor under the Program. Even so, Hines notes the Foundation does not dispute (and does not dispute here) that the Foundation gave endowed donors, that is the members of the putative class, the best seats that were available to the Foundation and the best parking

---

[7]As to corporate entities, the Foundation's polices always provided that corporate endowments were limited to twenty-five-year terms.

available to the Foundation for many years after the donors created endowed scholarships under the Program. For example, Hines points to his experience as typical. He received preferential seats and parking in desirable locations at Kyle Field for decades. On more than one occasion, he upgraded his seats at Kyle Field at no charge. The record demonstrates other endowed donors did so as too.

In 2006, the record shows the policies previously followed by the Foundation changed when the Foundation created a priority system. Under the priority system, the Foundation ranked the members of the Foundation (including the endowed donors) and assigned each of the members points. The system was based on criteria, which included each member's annual contributions to the Foundation and to the Foundation's designated programs. Privileges allocated to the Foundation's members were derived from each member's rank. Under the priority ranking system, the members of the Foundation were required to contribute additional money or risk losing their privileges, even if they were endowed donors under the Program.

Even more changes occurred in 2015 when the Foundation instituted a plan to reseat all season ticketholders as part of the renovations to Kyle Field. To obtain seats, ticketholders (including members of the putative class) were required to make capital or annual contributions, which were applied to the Kyle Field Capital Campaign. For its part, the Foundation sent members of the putative class a letter stating the Foundation would credit $2,000 per seat/per year toward that member's

6

annual or capital contribution. Yet the evidence presented by Hines shows the credit offered by the Foundation was insufficient to allow members of the putative class to obtain seats comparable to the seat that member previously held at Kyle Field before the football stadium was renovated. According to Hines, the memo informing members of the putative class about the capital contributions needed to renovate Kyle Field is one of the facts common to all class members that shows the Foundation breached its oral and written agreements to provide endowed donors with the best seats and parking available to endowed donors at no additional cost as a benefit of creating an athletic scholarship under the Program.

## Procedural Background

Hines and fourteen other plaintiffs sued the Foundation and the Trustees of the Foundation in December 2017.[8] The suit alleged the Foundation, and the Trustees breached the endowment contracts the Foundation made with the fourteen plaintiffs. The plaintiffs also sued the defendants for promissory estoppel and breach of fiduciary duty.

---

[8]The Foundation moved to transfer venue in the suit, alleging that venue was improper because all or a substantial part of the events leading to the suit occurred outside Newton County. The plaintiffs other than Hines then voluntarily agreed to an order severing the case and agreed to transfer their claims to Brazos County. Only Hines, a Newton County resident, remained in the suit in Newton County. After the suit was severed, Hines amended his petition, brining suit individually and "on behalf of all similarly situated purchasers of Defendant Texas A&M University 12th Man Foundation 'Permanently Endowed Scholarship Program' agreements."

In June 2019, Hines moved to certify a class of "all owners and beneficiaries" of the Permanently Endowed Scholarship Program who had not released their claims against the Foundation for "the imposition of additional charges or fees for home and away football game seating benefits and home football parking benefits, and/or for the diminution of those benefits." Hines alleged the members of the putative class met the requirements necessary for the court to certify his suit and allow it to proceed as a class action.

In the trial court, Hines claimed the suit could be maintained as a class action because issues common to the putative class dominated over issues affecting only individual members of the class. According to Hines, the Foundation breached all promises to the members of the putative class in the same manner. Affidavits, signed by former Foundation officers, reflect they told prospective donors, who became endowed donors, they would receive tickets to games at no additional charge in return for endowing athletic scholarships under the Program. Hines also points to affidavits from some members of the putative class stating that one of the Foundation's executive directors, Green, told them that by donating to the Program, endowed donors would continue to receive tickets to games and parking at no additional charge.

In the trial court, the Foundation argued that class claims did not dominate over individual issues because questions about what promises may have been made

to each donor depended on different conversations that occurred between different Foundation officers over years when the Foundation's policies differed given that the oral agreements were never reduced to written form. To support that argument, the Foundation pointed to the evidence in the record showing the variety of agreements as to both their terms and the fact they are not memorialized in writing. The Foundation concludes that trying the suit as a class action will require resolving largely individualized issues, since none of the written terms of the oral agreements address parking, seating, or provide that the benefits will be provided for life at no added cost.

In September 2019, the trial court conducted an evidentiary hearing on Hines' motion to certify the suit as a class. In December 2019, the trial court signed an order granting Hines' motion. The order defines the class as follows:

> All owners and beneficiaries of a Texas A&M University 12th Man Foundation Permanently Endowed Scholarship Program Agreement who have not settled and released their claims against the 12th Man Foundation and its Trustees for the imposition of additional charges or fees for home and away football game seating benefits and home football parking benefits, and/or for the diminution of those benefits.[9]

---

[9] *Nat'l Gypsum Co. v. Kirbyville Indep. Sch. Dist.*, 770 S.W.2d 621, 627 (Tex. App.—Beaumont 1989, writ dism'd w.o.j.) (In determining whether to certify a class, trial courts may consider the pleadings and other material in the record, along with the evidence presented at the certification hearing.).

9

The order includes findings of fact, conclusions of law, and a trial plan.[10] In finding predominance, the trial court's class certification order states "the Foundation made uniform promises to [members of the putative class] and that the Foundation breached these promises in a uniform manner." In its order, the trial court rejected the Foundation's argument that individual issues will dominate the litigation, as it found no claims of members of the putative class (or the Foundation's defenses) would affect only individuals in trying the case. Based on that conclusion, the trial court ruled that the substantive issues of the members of the putative class were susceptible to proof on a class-wide basis in the trial of the case as a class-action suit.

Standard of Review

Class actions are exceptions "to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[11] Departure from that rule is justifiable only when the class representative has the same interest and injury as the others in the class.[12] Under Texas law, trial courts determine whether a departure

---

[10]Tex. R. Civ. P. 42(c); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 685 (Tex. 2002).

[11]*Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).

[12]*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011).

from the usual rule is appropriate by applying the requirements in Rule 42.[13] The party who moves for class certification bears the burden of proof under Rule 42.[14]

Rule 42(a) has four parts and provides that a suit may be maintained as a class action "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law, or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[15] In addition to these four requirements, class actions must meet additional requirements in Rule 42(b), including those in Rule 42(b)(3).[16] Rule 42(b)(3), which is our focus here, requires that courts determine whether the questions of law or fact common to the members of the class predominate over the questions that affect only individual members of the proposed class.[17] Since "predominance is one of the most stringent prerequisites to class action certification," we consider it first because that question—the question of predominance—is not a close issue on the record before us here.[18]

---

[13]Tex. R. Civ. P. 42.
[14]*Stromboe*, 102 S.W.3d at 694; Tex. R. Civ. P. 42(a).
[15]Tex. R. Civ. P. 42(a).
[16]*Id*. 42(b)
[17]*Id*. 42(b)(3).
[18]*Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 205 (Tex. 2007).

In assessing predominance, courts must identify the substantive issues that control the litigation, decide what issues will predominate in the case, and then determine whether those issues are in fact common to the class.[19] "The test for predominance is not whether common issues outnumber uncommon issues but. . . whether common or individual issues will be the object of most of the efforts of the litigants and the court."[20] "If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate."[21]

The Texas Supreme Court has instructed trial courts to perform a rigorous analysis and go beyond the pleadings to understand the claims, defenses, relevant facts, and substantive law before certifying a suit as a class-action suit.[22] Generally, determining whether a suit should be allowed to proceed as a class action involves legal issues that are entangled with disputed facts, so a trial court's certification order "must indicate how the claims will likely be tried so that conformance with Rule 42 may be meaningfully evaluated."[23] That said, Rule 42 does not require that trial

---

[19]*Id.*

[20]*Sw. Ref. Co., Inc. v. Bernal*, 22 S.W.3d 425, 434 (Tex. 2000) (internal quotations omitted); *see also Stonebridge*, 236 S.W.3d at 205.

[21]*Bernal*, 22 S.W.3d at 434.

[22]*Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 696 (Tex. 2008); *Bernal*, 22 S.W.3d at 435.

[23]*Bernal*, 22 S.W.3d at 435; *see Exxon Mobil Corp. v. Gill,* 299 S.W.3d 124, 126 (Tex. 2009) (per curiam).

courts adjudicate the merits of the parties' claims before they may certify the suit as a class action.[24] Even so, a trial court's order certifying a class must explain what issues are common to the class, what issues are individual to the members of the class, why the issues common to the class predominate over the issues that are individual to members of the class, and how the trial court is planning to handle the trial of the issues that are individual to and not common to the class.[25] Here, the trial court found there were no individual issues, but as we explained below, we disagree.

On appeal, orders certifying suits as class actions are reviewed under an abuse of discretion standard.[26] Under that standard, in certifying class actions, "[a] trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding principles."[27] When reviewing a trial court's order certifying a class, we do not "indulge every presumption in the trial court's favor, as compliance with the class action requirements must be demonstrated rather than presumed."[28] Like this Court, the trial court "must apply a rigorous analysis to determine whether all certification requirements have been satisfied."[29]

---

[24]*Union Pac. Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003) (stating that analyzing the substantive law for class-certification purposes requires "far less searching than in a trial on the merits").

[25]*Id.* at 72-73.

[26]*Bowden*, 247 S.W.3d at 696.

[27]*Id.*

[28]*Id.*

[29]*Id.*

Analysis

On appeal, the Foundation contends that the trial court erred in certifying the class for three reasons: (1) common issues do not predominate over the question that affects only individual members of the proposed class; (2) treatment of the claims in a class is not superior to the fair and efficient adjudication of the parties' controversy; and (3) the class, as defined by the trial court, is defined an improper, fail-safe class.

Hines sued the Foundation for breaching an alleged contract, an oral contract that he claims gave him the right to receive tickets to A&M football games and parking for life at no charge. But his contract claims depend on individualized proof as to what he was promised, and his class claims revolve around what was promised to other members of the putative class. The proof may or may not be the same. Regardless of whether the proof is the same in each case, there will be fact issues in each case as to whether the representations by the Foundation about the benefits were material to the endowed donor in his or her decision to endow the scholarship on the occasion in question, occasions that varied over time. We conclude the trial court failed to conduct a rigorous analysis in concluding that there were no individual issues that would be required to be decided based on individualized rather than class-

wide proof given the fact that the transactions were based largely on oral representations that were not reduced to writing. [30]

In proving the breach of uniform contract (unlike this case), the plaintiff would have to prove (1) a valid contract existed; (2) the plaintiff performed or tendered the performance contractually required; (3) the defendant breached the contract by failing to perform or tender the performance required by the terms of its contract; and (4) the plaintiff was damaged by the breach. [31]

But here, there are hundreds of putative class members, none of whom have uniform contracts with the Foundation. Some of the contracts are written, some are oral, some are partially written and partially oral. Before 1993, all the agreements under the Program were apparently oral. Sometime in 1992, the Foundation attempted, by letter, to memorialize the oral agreements it made with members of the Foundation under the Program. Yet nothing in those letters addresses rights to seating or to parking. Nor do the letters contain any terms touching on Hines' best-benefits claim.

---

[30]*See Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010) (noting courts have been reluctant to certify class claims, like promissory estoppel, when proof of reliance is a required element). *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 87 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); ("In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications.").

[31]*See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

While in some way Hines' oral agreement is consistent with the oral agreements described by other members of the putative class, the terms he described he bargained for are not entirely consistent with the terms that apply to the others. For instance, the terms differ as to their start and end dates, and as to payment. And as to contracts that have written terms, those agreements provide that the contracts cannot be modified unless the terms modifying the agreement are in writing.

So is proceeding with Hines' suit as a class action the superior and more efficient method of resolving his dispute? [32] The controversy will require resolving individualized statements about who said what and having a factfinder decide whether, in that particular transaction, the representation was a quid pro quo in the deal. The focus of the trial will be on what was said, the context in which what was said occurred, and whether the statements in that context were material to that specific endowed donor's decision to donate money to Texas A&M University. [33] It follows that answering the question about what a single donor thought was material to his or her decision as to tickets, seating, costs, and parking, would not necessarily answer the question as to all donors.

---

[32]Tex. R. Civ. P. 42(b)(3).

[33]We assume (without deciding) these transactions might be found by the factfinder to have been contracts, not gifts. The question of whether they were gifts rather than contracts was not argued in the trial court, nor was the argument presented here.

16

Accordingly, we conclude the trial court abused its discretion by failing to conduct a rigorous analysis in deciding whether Hines met the predominance requirement of Rule 42(b)(3).[34]

Promissory Estoppel

For the same reasons, we conclude Hines failed to prove his promissory estoppel claims were certifiable as a class. Under Texas law, promissory estoppel is an equitable remedy, but it is unavailable when an express contract covers the subject matter of the dispute.[35] When an express contract does not govern the dispute, which could be the case here depending on the factfinder's ultimate findings in Hines' case, he or she may nevertheless be able to obtain a promissory estoppel remedy by proving, (among other things) that the Foundation made a specific and definite promise and that they relied on that promise to their detriment.[36]

Regardless, exactly what the Foundation promised Hines, as well as the terms of the promise, are matters requiring a trial. Here, Hines failed to present class-wide proof to show the Foundation made a class-wide promise or that the endowed donors relied on a class-wide, uniform promise in deciding to give Texas A&M money for

---

[34]*See Stonebridge*, 236 S.W.3d at 205 (noting inescapable "individual differences between each class member's experience with Stonebridge that could determine in whose favor the equities weigh in resolving their claims").

[35]*See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

[36]*See English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

the purpose of endowing athletic scholarships at the University. That type of proof—meaning proof of a class-wide promise and class-wide reliance—is the type of proof needed to support a decision certifying a promissory-estoppel class under Rule 42.[37] It does not exist on the record before us here.

## Conclusion

Over two decades ago, the Texas Supreme Court rejected the "certify now and worry later" approach to class-action suits.[38] Here, Hines failed to prove that individual issues could be tried in a class-action trial in a fair, manageable, or time-efficient manner on a class-wide basis.[39] Consequently, we hold the trial court abused its discretion in granting Hines' motion to certify a class-action suit of "all owners and beneficiaries of a Texas A&M University 12th Man Foundation Permanently Endowed Scholarship Program Agreement who have not settled and released their claims against the 12th Man Foundation and its Trustees for the imposition of additional charges or fees for home and away football game seating benefits and home football parking benefits, and/or for the diminution of those benefits."

---

[37]*See Mktg. on Hold Inc.*, 308 S.W.3d at 921; *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 163 (Tex. 2007).
[38]*Bernal*, 22 S.W.3d at 435.
[39]*Stonebridge*, 236 S.W.3d at 207.

We reverse the trial court's Order Granting Plaintiff's Motion For Class Certification and Trial Plan. We remand the case to the trial court for further proceedings consistent with the Court's opinion.

REVERSED AND REMANDED.

_____
HOLLIS HORTON
Justice

Submitted on May 26, 2021
Opinion Delivered February 24, 2022

Before Kreger, Horton and Johnson, JJ.